### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 00-6334** |
| | : | **CR - FERGUSON** |
| **Plaintiff,** | : | |
| vs. | : | |
| | : | **Fla. Bar No. 100028** |
| **LOUIS FRANK PETRILLO,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### DEFENDANT'S MOTION TO SUPPRESS & REQUEST FOR HEARING

Defendant, by counsel, moves to suppress the following evidence which the United States may use against the Defendant, for the reason that such evidence was obtained in violation of the Defendant's rights under US Const. Amend(s) 5th and 6th and, as such is inadmissible in any trial, hearing or other proceeding against Defendant. *See Docket No. 17, Transcript of December 6, 2000 Hearing.*

### Undisputed Facts

1. At all times material hereto, from a time prior Defendant was represented by legal counsel, Ruben Oliva, Esq. and Walter Reynoso, Esq., in a pending criminal case, *United States v. Louis Frank Petrillo,* Case No. 93-442-Cr-Zloch, So.Dist. Fla., which has been pending since 1993 and in which Defendant has been accused of violating conditions of his five (5) year probation.

2. At all times material hereto, the United States has been represented by Robert J. Lehner, AUSA, who is prosecuting the Defendant's alleged probation violation in *United States v. Louis Frank Petrillo, supra.*

3. At all times material hereto, including all times prior to January 1, 1998 and prior thereto, the United States, by AUSA Robert J. Lehner, and otherwise, was aware that Louis Frank Petrillo was represented by legal counsel in *United States v. Louis Frank Petrillo, supra.* Federal and State Income Tax Matters, pending Medicaid and Medicare matters and other criminal matters and Defendant's right to counsel had attached as to each and all of these matters. US Const. Amend. 6th



4. Despite the United State's knowledge that Defendant was represented by legal counsel, the United States, by its agents, arranged with a confidential informant, Lawrence Pinkoff, under their control and direction, and arranged for agents of the United States to set up a video/audiotape surveillance in an office where they knew Defendant would appear to videotape and audiotape Defendant's conversations with the United State's confidential informer, Lawrence Pinkoff. The United States, by its agents knew of and arranged for the video/audio taping.

5. As a result of the video/audio taping of Defendant and the United State's confidential information, Lawrence Pinkoff, the United States obtained recorded statements of the Defendant which led to the discovery of other evidence which the United States intends to use against the Defendant in criminal prosecutions, including the case of *United States v. Louis Frank Petrillo, Case No. 93-442-Cr-Zloch, Case No. 93-6334-Cr-Ferguson, other pending investigations* and other yet unfiled prosecutions.

## Memorandum of Law In Support of Motion

The right to counsel granted by the US Const , 6th Amend, attaches at or after the time that judicial proceedings have been initiated against a Defendant, because, as here, after the initiation of adversary criminal proceedings the government has committed itself to prosecute, and ... the adverse positions of government and Defendant have solidified. *Maine v. Moulton,* 106 S Ct 477, at 477 (1985).

Once the right to counsel has attached and been asserted, the government must honor it and the government can not prevent the accused from obtaining the assistance of counsel. *Id.* at 484.

It is a violation of the Defendant's 6th Amendment right to counsel for the United States to utilize a confidential informant to obtain incriminating or other evidence against a Defendant without advising the legal counsel representing Defendant. *Moulton, supra, at 487.* This is especially true when the United States knows that the confidential informant and the Defendant are meeting for the purpose of discussing pending charges and planning a defense for a trial and which the Defendant had a constitutional right not to make to their agent prior to consulting with his legal counsel. *Moulton, supra, at 487.*

By concealing from defendant the fact that Lawrence Pinkoff was an agent of the State of Florida or the United States, the police/United States, by its agents, denied Defendant, Louis Frank Petrillo the opportunity to consult with his legal counsel, at videotapings using Lawrence Pinkoff, as an agent for the United States, in violation of the Defendant's US Const. Amend. 6th right to counsel. *Moulton, supra, at 488.*

In *Moulton, supra,* the prosecution argued that the incriminating statements they obtained should not be suppressed because the police had other legitimate reasons for listening to Moulton's conversations with the confidential informant, namely to investigate Moulton's alleged plan to kill someone and wished to protect against the killing. *Moulton, supra, at 488.*

Nevertheless, the Supreme Court ruled that even so, the statements made by the Defendant to the confidential information could not be used by the prosecution as evidence against him. *Moulton, supra, at 489.*

> "Consequently, incriminating statements pertaining to pending
> charges are inadmissible at the trial of those charges, notwithstanding
> The fact that the police are also investigating other crimes, if, in
> obtaining this evidence the state violated the Sixth Amendment by
> knowingly circumventing the accused's right to the assistance
> of counsel." *Moulton, supra at 489.*
>
> "Because we hold that the Maine police knowingly circumvented
> Moulton's right to have counsel present at a confrontation between
> Moulton and a police agent, the fact that the police had additional
> reasons for recording Moulton's meeting with [their confidential informant]
> is irrelevant." *Moulton, supra, at 489.*

Accordingly, the Supreme Court affirmed the suppression of all evidence obtained by the recordings obtained at the meetings between Moulton and the confidential informant. *Id at 489.*

In the case, *sub judice*, which is on all points with *Moulton, supra*, we have the same set of circumstances which require suppression of all evidence obtained against Defendant Petrillo by use of the audio/visual tapes. This includes all statements, all documents and all evidence which is the "fruit of the poisonous tree", whether sought to be used against the Defendant or any other person, in Case No. 00-6334-Cr-Ferguson, Case No. 93-442-Cr-Zloch or any other prosecution of a matter in which Defendant had consulted with counsel prior to the video/audio taping of the Defendant.

In the December 6, 2000 transcript of Hearing before the Hon. Lurana Snow, Magistrate Judge, in Case No. 00-6334-Cr-Ferguson, the United States, by AUSA Lehner, admitted to the Court, *inter alia*, that:

### Factual Proffer By AUSA Robert J. Lehner

" On the 19th of October of this year in Mr. Pinkoff's office in Dania, Florida, the Federal Bureau of Investigation conducted audio and visual surveillance of Mr. Pinkoff and Mr. Petrillo. And during that audio/video surveillance Mr. Pinkoff stated, amongst other things, that he had at his disposal a million dollars..." Tr. 8 {Docket No.17]

"On October the 26th of this year, the second audio/visual surveleillance by the FBI was conducted at the same place between the same two people, Mr. Petrillo and Mr. Pinkoff. During that period of time, Mr. Petrillo and Mr. Pinkoff – at the Defendant's urging, Mr. Pinkoff and he drew up a promissory note line of credit in which Mr. Petrillo was urging that this be done in order so as to show monies and funds that he had received that was the subject of the violation of standard conditions in the probation violation to show that these monies were in fact loans and not income to him." Tr. 9

"So in that meeting on the 26th of October 2000, a document was drawn up – it is called a promissory note line of credit, and it is backdated by him, signed by Louis Petrillo, allegedly dated November the 1st 1998, and it was actually done under the audio/visual surveleillance of the FBI on the 26th of October of this year."Tr. 9

."  Also in that October 26th, 2000 audio/video surveillance, Mr. Petrillo made threats to the person of the Probation Officer, Mr. Will, Frank Will.  And from what we – from what was said on the audio/video surveillance, and we have here before your Honor if your Honor wishes to see any part of it, the derogatory comment by Mr. Petrillo. [referring to the transcript of the audio/video tape] And then after that, after this is over —he's going to be suffering a lot more than me or you.  This is shown on the audio/visual --- video surveillance conducted by the FBI."  Tr. 10

"Additionally, from  informant information the Defendant has during the past nine months made various threats t the life of Mr. Will.  And what he said is , after this thing is over, meaning the probation violation, Frank, indicating Frank Will, isn't going to be around anymore, and Mr. Petrillo bragged that he was not going to have anything to do with it, 'but I know people who could take care of it' ' Don't leave me in a room with him alone'" Tr. 10, 11

"Then on November 27th, as shown in the Indictment, another event occurred.  Mr. Petrillo's Mr. Petrillo's attorneys, rather Rubin Oliva and Mr. Oliva's forensic accountant, Mr. Foodman, F-o-o-d-m-a-n, appeared in our offices, the U.S. Attorney's office in Miami and with Mr. Sellars, who is here in court with me and we met with Mr. Oliva and Mr. Foodman.  Mr. Sellars is a financial auditor with the economic crime section of the U.S. Attorney's office in Miami."  Tr. 11

"At that time the very documents, some of the very documents that were seen on the audio/visual surveillance of October 26th were submitted to Mr. Sellars and myself by Mr. Foodman, the forensic accountant, and Mr. Oliva, the defense attorney for Mr. Petrillo, urging us to believe that these monies that we knew from – from bank records and fro an interview of Mr. {Pinkoff were income to Mr. Petrillo...." Tr. 12

"So again, this shows not only attempting to obstruct justice, as he had done in the past by lying about his – the amount of funds in order to reduce his restitution..." Tr. 12

"Additionally, on the Audio/visual surveillance of the 26th of October, Mr. Petrillo also stated that as to the First Standard Condition of Violation the fact that he was not in the hotel for the dates that he stated he was. And the information we have is that he was actually visiting with .... at the time..." Tr. 13

"He states on the audio/visual taping of the 26th of October of this year that he paid $534 to the hotel people in order to — and that they took the money in order to get these receipts...." Tr. 13

"Now, I'm reading from a draft of the audio and visual and, of course, I know about the standard discovery order and that we will endeavor to get a final version and get it to defense counsel within the time allotted during the standard discovery order. So we have an admission of that audio/visual surveillance of him lying about violation Number One as well." Tr. 13, 14

"Additionally, one of the trips that Mr. Petrillo took during his – during his probation period was in April of 1999 to Lichenstein. And during that trip he supposedly was going to a medical convention in connection with his $50,000 a year —alleged $50,000 a year job working for Mr. Pinkoff..." Tr. 14

*See Tr. 14 - 19 for other admissions obtained from Petrillo by the use of the confidential informant, Pinkoff on the FBI conducted videotape. The Transcript is filed as Docket No. 17, sub judice.*

### Cross Examination of Government Agent Sellars

By Mr. Paglino:   So did you hear any threats on the life of Mr. Will other than what you just said ? Tr. 26

| | |
|---|---|
| Agent Sellars: | Other than what has been told to me in conversations with a cooperating witness, no sir. Tr. 26 |
| By Mr. Paglino: | Were these recorded threats ? Tr. 27 |
| Agent Sellars: | No sir. If I can just kind of lay out a time frame for you. As a result of our finding out about the potential threats to Mr. Will's life, we then began a process – actually the FBI began a process where Mr. Pinkoff agreed to have his office wired for audio and video. It was after that, that we began videotaping.... Tr. 27 |
| By Mr. Paglino: | Who is the confidential informant ? Tr. 27 |
| Agent Sellars: | Mr. Pinkoff. Tr. 27 |

It is undisputed that the government, in clear violation of Defendant Petrillo's 5th, 6th Amendment rights, utilized a cooperating, confidential informant, acting as an agent for the United States, to assist in audio/videotaping the Defendant, at a time when the United States knew that the Defendant was represented by counsel and his right to counsel had attached, and, the Defendant was in the midst of a prosecution against him by the United States. This was impermissible and a violation of Defendant's 5th, 6th Amendment rights.

The right to counsel granted by the US Const., 6th Amend. attached to Defendant, Louis Frank Petrillo, at or after the time that judicial proceedings for violation of conditions of probation in Case No. 93-442-0Cr-Zloch were initiated against him, an adversary, criminal proceeding, for which Defendant faces criminal penalties and for which the United States had committed to and was prosecuting. After the initiation of the adversary, criminal proceedings against Mr. Petrillo, which the government had committed itself to prosecute, and ... the adverse positions of government and Defendant solidified; the government could not use a confidential agent of the United States, Pinkoff , to obtain information from the Defendant, without first advising Defendant's counsel or Defendant that it planned to do so.. *Maine v. Moulton,* 106 S.Ct. 477, at 477 (1985). It is undisputed that no such advice or warning was given to Defendant's legal counsel.

Once the right to counsel has attached and been asserted, the government must honor it and the government can not prevent the accused from obtaining the assistance of counsel. *Id.* at 484.

It is a violation of the Defendant's 6th Amendment right to counsel for the United States to utilize a confidential informant to obtain incriminating or other evidence against a Defendant without first advising the legal counsel representing Defendant. *Moulton, supra, at 487.* This is especially true when the United States knows that the confidential informant and the Defendant are meeting, in whole or part, for the purpose of discussing pending charges and planning a defense for a trial and which the Defendant had a constitutional right not to make statements to their agent prior to consulting with his legal counsel. *Moulton, supra, at 487.*

By concealing from defendant the fact that Lawrence Pinkoff was an agent of the State of Florida or the United States, the police/United States, by its agents, denied Defendant, Louis Frank Petrillo the opportunity to consult with his legal counsel, which is a violation of the Defendant's US Const. Amend. 6th right to counsel. *Moulton, supra, at 488.*

In *Moulton, supra,* as may happen here, the prosecution argued that the incriminating statements they obtained should not be suppressed because the police had other legitimate reasons for listening to Moulton's conversations with the confidential informant, namely to investigate Moulton's alleged plan to kill someone and wished to protect against the killing. *Moulton, supra, at 488.* [alleged concerns that Mr. Petrillo might harm the Probation Officer, Frank Will, supra]

Nevertheless, the Supreme Court ruled that even so, the statements made by the Defendant to the confidential information could not be used by the prosecution as evidence against him. *Moulton, supra, at 489.*

> "Consequently, incriminating statements pertaining to pending
> charges are inadmissible at the trial of those charges, notwithstanding
> The fact that the police are also investigating other crimes, if, in
> obtaining this evidence the state violated the Sixth Amendment by
> knowingly circumventing the accused's right to the assistance
> of counsel." *Moulton, supra at 489.*

Page 8 of 10

> "Because we hold that the Maine police knowingly circumvented
> Moulton's right to have counsel present at a confrontation between
> Moulton and a police agent, the fact that the police had additional
> reasons for recording Moulton's meeting with [their confidential informant]
> is irrelevant." *Moulton, supra, at 489.*

Accordingly, just as the Supreme Court affirmed the suppression of all evidence obtained by the recordings obtained at the meetings between Moulton and the confidential informant, because the state did not advise the Defendant or his counsel that it would be using a government agent/confidential informant to obtain information from the Defendant, by using the videotaping, *Id at 489,* the Court(s) should suppress all evidence obtained from or arising from evidence obtained from the audio/videotaping of Defendant Petrillo or otherwise obtained from Lawrence Pinkoff, the undisclosed, confidential, agent for the United States..

### Conclusion

Pursuant to the Supreme Court of the United State's decision in *Maine v. Moulton, supra,* 106 S.Ct. 477 (1985), all evidence obtained by the United States from the audio/video tapes of October 19 & 26, 2000 and all evidence obtained through the use of the Confidential Informant/Agent for the United States, Lawrence Pinkoff, should be suppressed and can not be used in any criminal prosecution against the Defendant, including Case No. 00-6334-Cr-Ferguson, Case No. 93-442-Cr-Zloch or in any other state or federal prosecution

### CERTIFICATE OF GOOD FAITH

Counsel for Defendant has discussed the involved Attorney-Client matter(s) with the United States, by AUSA Lehner, but has been unable to resolve the situation. It is hoped that, upon further consideration of the matter, the United States will agree that the evidence in question will be suppressed and not attempt to use any of the evidence or the fruits thereof, in any criminal prosecution against the Defendant and will, accordingly, advise the state of Florida agents, with whom the United States is acting in concert, that they should not being any prosecution based upon any such tainted evidence.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by United States Mail this _____ day of December, 2000 to Robert J. Lehnar, A.U.S.A., 99 N.E. 4th Street, 4th Floor, Miami, Florida 33132-2111 and a courtesy copy to Ruben Oliva, Esq., a legal counsel continually representing the Defendant in his Probation Violation proceeding and otherwise in that Case No. 93-442-Cr-Zloch.

Respectfully submitted

Law Office of Joseph S. Paglino
Co-counsel for Defendant
12865 West Dixie Highway
North Miami, Florida 33161
Tel. (305) 758-8017

Law Office of Walter A. Reynoso, P.A.
Co-counsel for Defendant
Grove Forest Plaza, Suite 107
2937 Southwest 27th Avenue
Miami, Florida 33133
Tel. (305) 642-8961

By _____
Joseph S. Paglino, Esq.

474 U.S. 159, 88 L.Ed.2d 481

₁₅₉MAINE, Petitioner,

v.

Perley MOULTON, Jr.

No. 84–786.

Argued Oct. 8, 1985.

Decided Dec. 10, 1985.

Defendant was convicted in state court of burglary and theft, but the Supreme Judicial Court of Maine, 481 A.2d 155, reversed and remanded. On grant of Maine's petition for certiorari, the Supreme Court, Justice Brennan, held that State violated Sixth Amendment rights of defendant, who had already been charged with crimes, when it arranged to record conversations between defendant and codefendant, who was operating as undercover agent for State, and defendant's incriminating statements were inadmissible, notwithstanding that State also had legitimate reason for intercepting conversations in regard to its investigation of possible other uncharged offenses.

Affirmed.

Chief Justice Burger filed dissenting opinion in which Justices White and Rehnquist joined and Justice O'Connor joined in part.

**1. Criminal Law** ⚖=641.1, 641.3(3)

Assistance of counsel is necessary to safeguard other procedural safeguards provided to accused by criminal justice process, and thus, right to assistance of counsel is not limited to participation in trial, since to deprive person of counsel during period prior to trial may be more damaging then denial of counsel during trial itself; right to counsel means at least that person is entitled to help of lawyer at or after time that judicial proceedings have been initiated against him. U.S.C.A. Const.Amend. 6.

**2. Criminal Law** ⚖=641.7(1)

Once right to counsel has attached and been asserted, State must honor it, and this means more than simply that State cannot prevent accused from obtaining assistance of counsel; Sixth Amendment also imposes on State affirmative obligation to respect and preserve accused's choice to seek this assistance. U.S.C.A. Const.Amend. 6.

**3. Criminal Law** ⚖=641.12(1)

Under Sixth Amendment, prosecutor and police have affirmative obligation not to act in manner that circumvents and thereby dilutes protection afforded by right to counsel. U.S.C.A. Const.Amend. 6.

**4. Criminal Law** ⚖=412.2(1), 641.3(6)

Sixth Amendment right to counsel is not violated whenever, by luck or happenstance, State obtains incriminating statements from accused after right to counsel has attached. U.S.C.A. Const.Amend. 6.

**5. Criminal Law** ⚖=412.2(4), 641.3(6)

Knowing exploitation by State of opportunity to confront accused without counsel being present is as much breach of State's obligation not to circumvent right to assistance of counsel as is intentional creation of such opportunity; accordingly, Sixth Amendment is violated when State obtains incriminating statements by knowingly circumventing accused's right to have counsel present in confrontation between accused and State agent. U.S.C.A. Const. Amend. 6.

**6. Criminal Law** ⚖=412.2(4), 641.3(6)

Proof that State must have known that its agent was likely to obtain incriminating statements from accused in absence of counsel suffices to establish Sixth Amendment violation. U.S.C.A. Const.Amend. 6.

**7. Criminal Law** ⚖=641.12(2)

State violated Sixth Amendment rights of defendant, who had already been charged with crimes, when it arranged to record conversations between defendant and codefendant, who was operating as undercover agent for State; State knew that defendant and codefendant were meeting for express purpose of discussing pending charges and planning defense, and thus knew that defendant would make statements that he had constitutional right not to make to State agent prior to consulting with counsel. U.S.C.A. Const.Amend. 6.



**8. Criminal Law ⚖=412.2(4)**

Incriminating statements pertaining to pending charges are inadmissible at trial of those charges, notwithstanding fact that police were also investigating other crimes, if, in obtaining this evidence, State violated Sixth Amendment by knowingly circumventing accused's right to assistance of counsel. U.S.C.A. Const.Amend. 6.

**9. Criminal Law ⚖=412.1(2)**

Incriminating statements made by defendant, after filing of formal charges against him, to codefendant, who was operating as undercover agent for State, were inadmissible, notwithstanding that State also had legitimate reason for recording defendant's statements to codefendant, i.e., to investigate defendant's alleged plan to kill State witness and to insure codefendant's safety. U.S.C.A. Const.Amend. 6.

*Syllabus* *

Respondent, represented by retained counsel, pleaded not guilty in a Maine Superior Court to charges of theft by receiving of automotive vehicles and parts. Respondent's codefendant Colson informed the police that he had received anonymous threatening telephone calls regarding the pending charges and indicated that he wished to talk to the police about the charges. Before meeting with the police, Colson met with respondent to plan for the upcoming trial, and, according to Colson, respondent suggested the possibility of killing a State's witness. Thereafter, Colson and his lawyer met with police officers, and Colson confessed to his participation with respondent in committing the crimes for which they had been indicted and agreed to testify against respondent and cooperate in the prosecution of respondent on the pending charges if no further charges were brought against Colson. Colson also consented to have a recording device placed on his telephone, and agreed to record any anonymous threats or any calls from respondent. Having learned from recorded telephone calls that Colson and respondent were going to meet to plan defense strategy for the upcoming trial, the police obtained Colson's consent to be equipped with a body wire transmitter to record the meeting. Although Colson was instructed not to attempt to question respondent at the meeting, his remarks in fact caused respondent to make incriminating statements. The trial court denied respondent's pretrial motion to suppress the recorded statements he made to Colson as having been obtained in violation of respondent's right to the assistance of counsel under the Sixth and Fourteenth Amendments on the ground that the recordings were made for other reasons. Some of respondent's recorded incriminating statements made at the meeting with Colson were admitted in evidence, and respondent was convicted of some of the charges. The Supreme Judicial Court of Maine reversed and remanded for a new trial.

*Held:* Respondent's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements made by him to Colson after indictment and at the meeting of the two to plan defense strategy for the upcoming trial. Pp. 483–490.

(a) The assistance of counsel is necessary to safeguard the other procedural safeguards provided to the accused by the criminal justice process. Accordingly, the right to the assistance of counsel is not limited to ⌊₁₆₀participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. Whatever else it may mean, the right to counsel means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him. Pp. 483–484.

(b) Once the right to counsel has attached and been asserted, the State must honor it. At the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499.

and thereby dilutes the protection afforded by the right to counsel. *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Pp. 484–486.

(c) The State misreads *Massiah, supra*, and *Henry, supra*, in contending that the decisive fact in those cases was that the police set up the confrontation between the accused and a police agent at which incriminating statements were elicited, and that thus respondent's Sixth Amendment rights were not violated here because he rather than Colson initiated the recorded conversations. The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. Knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Pp. 486–487.

(d) In this case, the State clearly violated respondent's Sixth Amendment right when it arranged to record conversations between respondent and its undercover informant, Colson. When the police requested that Colson wear a body wire transmitter to the meeting with respondent, the police knew that respondent would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel. By concealing the fact that Colson was an agent of the State, the police denied respondent the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment. Pp. 487–488.

(e) There is no merit to the argument that the incriminating statements obtained by the police should not be suppressed because the police had other, legitimate reasons for listening to respondent's conversations with Colson, namely, to investigate respondent's alleged plan to kill the State's witness and to insure Colson's safety. This same argument was rejected in *Massiah, supra*, where the Court held that to allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert the need to investigate other crimes to justify their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the [161]evisceration of the Sixth Amendment right. Evidence obtained that is relevant to crimes as to which the Sixth Amendment right has not yet attached may be admissible at a trial on those charges. Pp. 488–489.

481 A.2d 155 (D.Me.1984), affirmed.

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C.J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, and in Parts I and III of which O'CONNOR, J., joined, *post*, p. 489.

Wayne Stuart Moss, Augusta, Me., for petitioner.

Anthony Whitcomb Beardsley, Ellsworth, Me., for respondent.

Justice BRENNAN delivered the opinion of the Court.

The question presented in this case is whether respondent's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements made by him to his codefendant, a secret government informant, after indictment and at a meeting of the two to plan defense strategy for the upcoming trial.

I

On the night of January 15, 1981, police officers in Belfast, Maine, responded to a fire call in the vicinity of the Belfast Dodge automobile dealership. Arriving at the scene, the officers discovered a burning Chevrolet dump truck which they recognized as a vehicle that had been reported

fter Colson's role as an in-
en revealed to Moulton, the
pending indictments dis-
ined seven new indictments
1. These indictments real-
ing charges, and charged
tion with burglary, arson,
thefts. Moulton pleaded
arges contained in two of
s, and the trial court dis-
ore for improper venue.
his right to a jury and
al on the remaining three
ch covered the subjects of
ctments and charged him
irson, and theft. At the
lid not offer into evidence
ie recorded telephone con-
did offer portions of the
ember 26 meeting, princi-
iving direct discussion of
ich Moulton was originally
ate did not offer the por-
ng during which Moulton
ssed the possibility of kill-
l offered only one portion
1 about developing false
ie conclusion of the trial,
'd one more count of theft
ie and found Moulton not
son charge. The court
ilty, however, of burglary
ection with the Ford pick-
evrolet dump truck, and
ive parts.

led these convictions on
ie admission into evidence
s to Colson violated his
right to the assistance of
te filed a cross-appeal ob-
nissal of charges for im-
e Supreme Judicial Court
both appeals and remand-
d. 481 A.2d 155 (D.Me.

noments later, Colson imme-
ly and deliberately: "I want
ith some dates. One date I
Caps [Moulton's nickname].
r, I know it was in Decem-
we break into Lothrop Ford?
: 23.

1984). Regarding the admission of Moul-
ton's recorded statements to Colson, the
court agreed that there was "ample evi-
dence" to support the trial court's finding
that ₁₆₈the police wired Colson for legit-
imate purposes, but held that "[r]eference
to the State's legitimate motive may be
relevant to, but cannot wholly refute, the
alleged infringement of Moulton's right to
counsel." *Id.*, at 160. The court held that
the State cannot use against Moulton at
trial recordings of conversations where the
State "knew, or should have known" that
Moulton would make incriminating state-
ments regarding crimes as to which
charges were already pending. Pointing to
Moulton's close relationship with Colson,
the fact that the purpose of their meeting
was to discuss the pending charges, and
the fact that at the time of the meeting
Colson was "fully cooperating with the po-
lice and no longer stood in the same adver-
sarial position as did Moulton," the court
held:

"When the police recommended the
use of the body wire to Colson they
intentionally created a situation that they
knew, or should have known, was likely
to result in Moulton's making incrimina-
ting statements during his meeting with
Colson. The police's valid purpose in
investigating threats against witnesses
does not immunize the recordings of
Moulton's incriminating statements from
constitutional attack. Those statements
may be admissible in the investigation or
prosecution of charges for which, at the
time the recordings were made, adver-
sary proceedings had not yet com-
menced. But as to the charges for which

6. Justice Black explained in *Gideon v. Wain-
wright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799
(1963):

"[R]eason and reflection require us to recognize
that in our adversary system of criminal justice,
any person haled into court ... cannot be as-
sured a fair trial unless counsel is provided for
him. This seems to us to be an obvious truth.
Governments, both state and federal, quite prop-
erly spend vast sums of money to establish
machinery to try defendants accused of crime.
Lawyers to prosecute are everywhere deemed
essential to protect the public's interest in an

Moulton's right to counsel had already
attached, his incriminating statements
should have been ruled inadmissible at
trial, given the circumstances in which
they were acquired." *Id.*, at 161.

We granted the State's petition for certio-
rari. 469 U.S. 1206, 105 S.Ct. 1167, 84
L.Ed.2d 319 (1985). We affirm.

II

A

[1] The right to the assistance of coun-
sel guaranteed by the Sixth and Fourteenth
Amendments is indispensable to the fair
administration of our adversarial system of
criminal justice.[6] ₁₆₉ Embodying "a real-
istic recognition of the obvious truth that
the average defendant does not have the
professional legal skill to protect himself,"
*Johnson v. Zerbst,* 304 U.S. 458, 462–463,
58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938),
the right to counsel safeguards the other
rights deemed essential for the fair prose-
cution of a criminal proceeding. Justice
Sutherland's oft-quoted explanation in
*Powell v. Alabama,* 287 U.S. 45, 53 S.Ct.
55, 77 L.Ed. 158 (1932), bears repetition
here:

"The right to be heard would be, in many
cases, of little avail if it did not compre-
hend the right to be heard by counsel.
Even the intelligent and educated layman
has small and sometimes no skill in the
science of law. If charged with crime,
he is incapable, generally, of determining
for himself whether the indictment is
good or bad. He is unfamiliar with the
rules of evidence. Left without the aid
of counsel he may be put on trial without

orderly society. Similarly, there are few de-
fendants charged with crime, few indeed, who
fail to hire the best lawyers they can get to
prepare and present their defenses. That
government hires lawyers to prosecute and de-
fendants who have the money hire lawyers to
defend are the strongest indications of the wide-
spread belief that lawyers in criminal courts are
necessities, not luxuries. The right of one
charged with crime to counsel may not be
deemed fundamental and essential to fair trials
in some countries, but it is in ours." *Id.*, at 344,
83 S.Ct., at 796.

a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every stage of the proceedings against him." *Id.*, ⌊170at 68–69, 53 S.Ct., at 64 (quoted in *Gideon v. Wainwright,* 372 U.S. 335, 344–345, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963)).

As indicated in the last sentence of this paragraph, the Court has also recognized that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, "critical" stages in the criminal justice process "where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *United States v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967) (quoted in *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984)). See, *e.g., Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). And, "[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him...." *Brewer v. Williams,* 430 U.S.

387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). This is because, after the initiation of adversary criminal proceedings, "'the government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" *Gouveia, supra,* 467 U.S., at 189, 104 S.Ct., at 2298 (quoting *Kirby v. Illinois, supra,* 406 U.S., at 689, 92 S.Ct., at 1882).

B

[2, 3] Once the right to counsel has attached and been asserted, the State must of course honor it.[7] This means more than ⌊171simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

In *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the defendant, who had already been indicted, was coercively interrogated by police until the early hours of the morning despite his repeated requests to see his lawyer. A unanimous Court reversed his conviction on the ground that the confession obtained by this interrogation was involuntary and therefore should not have been admitted into evidence at trial. Four Justices, in two concurring opinions, stated that they would also have reached this result on the ground

---

7. Cf. *Brewer v. Williams,* 430 U.S., 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977): "[T]he lawyer is the essential medium through which the demands and commitments of the sovereign are communicated to the citizen. If, in the long run, we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise to this lawyer." *Id.,* at 415, 97 S.Ct., at 1248 (STEVENS, J., concurring) (footnote omitted).

:00-cv-06334-WDF　　Document 32　　Entered on FLSD Docket 12/20/2000　　Pa

that Spano's Sixth Amendment right to the assistance of counsel was violated. These Justices reasoned that to permit police to "produce the vital evidence in the form of a confession which is useful or necessary to obtain a conviction" in the absence of counsel, after the right to counsel has attached, is to deny the accused "effective representation by counsel at the only stage when legal aid and advice would help him." *Id.,* at 325–326, 79 S.Ct., at 1208–1209 (Douglas, J., concurring, joined by Black and BRENNAN, JJ.); see also, *id.,* at 326–327, 79 S.Ct., at 1209 (Stewart, J., concurring, joined by Douglas and BRENNAN, JJ.). As Justice Douglas succinctly put the point, "what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?" *Id.,* at 326, 79 S.Ct., at 1209.

⌊172 The position of the concurring Justices in *Spano* was adopted by the Court in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Massiah was indicted, along with a man named Colson,[8] for conspiracy to possess and to distribute cocaine. Massiah retained a lawyer, pleaded not guilty and was released on bail. Colson, meanwhile, decided to cooperate with Government agents in their continuing investigation of the narcotics activity in which Massiah and others were thought to be engaged. Colson permitted a Government agent to install a radio transmitter under the front seat of his automobile. Massiah held a lengthy conversation with Colson in this automobile while a Government agent listened over the radio. Massiah made several incriminating statements, and these were brought before the jury through the testimony of the Government agent. We reversed Massiah's conviction on the ground that the incriminating statements were obtained in violation of Massiah's rights under the Sixth Amendment. The Court stressed the fact that the interview took place after indictment, at a time when Massiah was clearly entitled to the assistance of counsel. Relying on Justice Douglas' *Spano* concurrence, the Court concluded that the need for, and consequently the right to, the assistance of counsel applied equally in this extrajudicial setting as at the trial itself. 377 U.S., at 204, 84 S.Ct., at 1202.[9] Consequently, the Court held:

> ⌊173 "[Massiah] was denied the basic protections of [the right to the assistance of counsel] when there was used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.,* at 206, 84 S.Ct., at 1203.

We applied this principle most recently in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Henry was arrested and indicted for bank robbery. Counsel was appointed, and Henry was held in jail pending trial. Nichols, an inmate at the same jail and a paid informant for the Federal Bureau of Investigation, told a Government agent that he was housed in the same cellblock as several federal prisoners, including Henry. The agent told Nichols to pay attention to statements made by these prisoners, but expressly instructed Nichols not to initiate any conversations and not to question Henry regarding the bank robbery. Nichols and Henry subsequently engaged in some

---

8. The parties have taken pains to assure us that Massiah's friend Colson and Moulton's friend Colson are unrelated.

9. Justice Stewart noted that this view of the right to counsel "no more than reflects a constitutional principle established as long ago as *Powell v. Alabama,*" where the Court noted that "'during perhaps the most critical period of the proceedings ... that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants [are] as much entitled to such aid [of counsel] ... as at the trial itself.'" *Massiah,* 377 U.S., at 205, 84 S.Ct., at 1202 (quoting *Powell v. Alabama,* 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1932)).

conversations during which Henry told Nichols about the robbery. Nichols testified about these conversations at Henry's trial, and Henry was convicted.

This Court reversed, finding that the Government had "'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah*." *Id.*, at 270, 100 S.Ct., at 2186. Several facts were emphasized in THE CHIEF JUSTICE's opinion for the Court: that Nichols was acting as an informant for the Government and therefore had an incentive to produce useful information; that Henry was unaware of Nichols' role as a Government informant; and, finally, that Henry and Nichols were incarcerated together at the time the conversations took place. With respect to this last fact, the Court reasoned that "confinement may bring into play subtle influences that will make [an individual] particularly susceptible to the ploys of undercover Government agents," influences that were facilitated by Nichols' "apparent status as a person sharing a common plight." *Id.*, at 274, 100 S.Ct., at 2189. Considering Nichols'[174] conversations with Henry in light of these circumstances, the Court concluded that Nichols "deliberately used his position to secure incriminating information from Henry when counsel was not present" in violation of the Sixth Amendment. *Id.*, at 270–271, 100 S.Ct., at 2187. The Government argued that it should not be held responsible for Nichols' conduct because its agent had instructed Nichols not to question Henry and had not intended that Nichols take affirmative steps to obtain incriminating statements. We rejected this argument, finding that, under the circumstances, the agent "must have known" that Nichols would take affirmative steps to secure incriminating information. *Id.*, at 271, 100 S.Ct., at 2187. Consequently, the Court held, "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Id.*, at 274, 100 S.Ct., at 2189.

C

The State contends that the decisive fact in *Massiah* and *Henry* was that the police set up the confrontation between the accused and a police agent at which incriminating statements were elicited. Supported by the United States as *amicus curiae*, the State maintains that the Sixth Amendment is violated only when police intentionally take this or some equivalent step. Because Moulton rather than Colson initiated the recorded telephone conversations and requested the December 26 meeting, the State concludes that Moulton's Sixth Amendment rights were not violated here.

In the first place, the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry*. Thus, while in *Massiah* it may have been the Government agent who was responsible for setting up the meeting with the defendant,[10] one discovers [175]this only by looking to the opinions of the Court of Appeals. It is not mentioned in this Court's opinion since the issue of who set up the meeting with whom was not pertinent to our disposition. Moreover, four years after *Massiah*, the Court summarily reversed a conviction where the defendant requested the meeting and initiated and led the conversa-

---

10. It is not clear whether the informant asked to meet with Massiah or vice versa. Both the opinion for the Second Circuit and the dissent state only that, on the instructions of a Government agent, Colson invited Massiah into his car to discuss their case; neither opinion establishes who requested the meeting in the first place. See *United States v. Massiah*, 307 F.2d 62, 66 (2nd Cir.1962); *id.*, at 72 (Hays, J., dissenting). It is quite plausible that Massiah asked to see Colson who then proposed meeting in his car. In fact, there is nothing in the record in *Massiah* to support even the assertion of the Court of Appeals that Colson rather than Massiah suggested meeting in Colson's car, although the inference is logical enough. See App. to Brief for United States in *Massiah v. United States*, O.T. 1963, No. 199, pp. 125a–175a (testimony of Agent Murphy).

tion in which incriminating statements were made to an undercover informant. *Beatty v. United States,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (*per curiam*). In that case, the Solicitor General made the same argument that he and the State make today, see Brief in Opposition, *Beatty v. United States,* O.T. 1967, No. 338, pp. 5–8; we rejected this argument in an opinion that simply cited *Massiah.*[11] Finally, in *Henry,* we deemed it "irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his codefendant while here the agents were fortunate enough to have an undercover informant already in close proximity to the accused." 447 U.S., at 272, n. 10, 100 S.Ct., at 2187, n. 10.

[4–6] ⌊176Beyond this, the State's attempt to limit our holdings in *Massiah* and *Henry* fundamentally misunderstands the nature of the right we recognized in those cases. The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. See *Henry,* 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring). However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.[12]

III

[7] Applying this principle to the case at hand, it is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant, Colson. It was the police who suggested to Colson that he record his telephone conversations with Moulton. Having learned from these recordings that ⌊177Moulton and Colson were going to meet, the police asked Colson to let them put a body wire transmitter on him to record what was said. Police Chief Keating admitted that, when they made this request, the police knew—as they must have known from the recorded telephone conversations—that Moulton and Colson were meeting for the express purpose of discussing the pending charges and planning a defense for the trial.[13] The police thus knew that Moulton

11. In his *amicus* brief for the United States in this case, the Solicitor General suggests that *Beatty* did not survive *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), which, he contends, modified *Massiah* to require affirmative interrogation by the Government. Brief for United States as *Amicus Curiae* 17, n. 12. That argument, however, was expressly rejected when the Solicitor General made it in *Henry.* See 447 U.S., at 271, 100 S.Ct., at 2187 ("While affirmative interrogation, absent waiver, would certainly satisfy *Massiah,* we are not persuaded, as the Government contends, that *Brewer v. Williams* ... modified *Massiah*'s 'deliberately elicited' test"). Cf. also,

Brief for United States in *United States v. Henry,* O.T. 1979, No. 121, p. 26, n. 12.

12. Direct proof of the State's knowledge will seldom be available to the accused. However, as *Henry* makes clear, proof that the State "must have known" that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation. See 447 U.S., at 271, 100 S.Ct., at 2187.

13. Because Moulton thought of Colson only as his codefendant, Colson's engaging Moulton in active conversation about their upcoming trial was certain to elicit statements that Moulton

would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel. As in *Henry*, the fact that the police were "fortunate enough to have an undercover informant already in close proximity to the accused" does not excuse their conduct under these circumstances. 447 U.S., at 272, n. 10, 100 S.Ct., at 2187, n. 10. By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.[14]

⌊178 IV

The Solicitor General argues that the incriminating statements obtained by the Maine police nevertheless should not be suppressed because the police had other, legitimate reasons for listening to Moulton's conversations with Colson, namely, to investigate Moulton's alleged plan to kill Gary Elwell and to insure Colson's safety. In *Massiah*, the Government also contended that incriminating statements obtained as a result of its deliberate efforts should not be excluded because law enforcement agents had "the right, if not indeed the duty, to continue their investigation of [Massiah] and his alleged criminal associates...." 377 U.S., at 206, 84 S.Ct., at 1203. There, as here, the Government argued that this circumstance justified its surveillance and cured any improper acts or purposes. We rejected this argument, and held:

⌊179 "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under

---

would not intentionally reveal—and had a constitutional right not to reveal—to persons known to be police agents. Under these circumstances, Colson's merely participating in this conversation was "the functional equivalent of interrogation." *Henry*, 447 U.S., at 277, 100 S.Ct., at 2190 (POWELL, J., concurring). In addition, the tapes disclose and the Supreme Judicial Court of Maine found that Colson "frequently pressed Moulton for details of various thefts and in so doing elicited much incriminating information that the State later used at trial." 481 A.2d, at 161. Thus, as in *Henry, supra*, 447 U.S., at 271, n. 9, 100 S.Ct., at 2187, n. 9, we need not reach the situation where the "listening post" cannot or does not participate in active conversation and prompt particular replies.

14. The State argues that it took steps to prevent Colson from inducing Moulton to make incriminating admissions by instructing Colson to "be himself," "act normal," and "not interrogate" Moulton. Tr. of Hearing on Motion to Suppress 42, 51, 56. In *Henry*, we rejected this same argument although the likelihood that the accused would talk about the pending charges to a cellmate was less than here, where the accused invited his co-defendant to discuss the upcoming trial, and although the instructions to the agent were far more explicit. See 447 U.S., at 268, 271, 100 S.Ct., at 2185, 2187. More importantly, under the circumstances of this case, the instructions given to Colson were necessarily inadequate. The Sixth Amendment protects the right of the accused not to be confronted by an agent of the State regarding matters as to which the right to counsel has attached without counsel being present. This right was violated as soon as the State's agent engaged Moulton in conversation about the charges pending against him. Because these charges were the only subject to be discussed at Colson's December 26 meeting with Moulton, a Sixth Amendment violation was inevitable once Colson agreed to this meeting with Moulton.

In any event, we reject the State's suggestion that these instructions were designed to protect Moulton's constitutional rights. The instructions were obviously motivated by the police's concern that Colson, who had never before served as an undercover agent, might behave unnaturally or ask too many questions, thereby tipping Moulton off to the fact that Colson was cooperating with the police. Thus, rather than explain to Colson that actively questioning Moulton might taint any evidence obtained, the police simply told Colson to "be himself," and to "act normal." Tr. of Hearing on Motion to Suppress 42, 51, 56. In addition, the instructions were not limited to questions concerning the pending charges, the only matters as to which active questioning might create problems. On the contrary, according to Chief Keating, Colson was instructed that he could engage Moulton in a conversation but should not try to draw him out on "elimination of witnesses or anything." *Id.*, at 51.

to insure Colson's safety. Government also contend-nating statements obtained s deliberate efforts should because law enforcement e right, if not indeed the ue their investigation of his alleged criminal associ- U.S., at 206, 84 S.Ct., at here, the Government ar-circumstance justified its cured any improper acts e rejected this argument,

question that in this case, es, it was entirely proper investigation of the sus- activities of the defend-leged confederates, even endant had already been hat we hold is that the n incriminating state- by federal agents under

xth Amendment protects the t not to be confronted by an garding matters as to which has attached without coun-This right was violated as agent engaged Moulton in the charges pending against charges were the only sub- l at Colson's December 26 n, a Sixth Amendment vio-once Colson agreed to this n.

eject the State's suggestion is were designed to protect onal rights. The instruc-motivated by the police's , who had never before over agent, might behave o many questions, thereby o the fact that Colson was police. Thus, rather than hat actively questioning ny evidence obtained, the on to "be himself," and to Hearing on Motion to In addition, the instruc-to questions concerning the only matters as to ig might create problems. rding to Chief Keating, that he could engage ion but should not try to nination of witnesses or

the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." *Id.*, at 207, 84 S.Ct., at 1203 (emphasis omitted).

[8, 9] We reaffirm this holding, which states a sensible solution to a difficult problem. The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime.[15] In seeking evidence pertaining to pending charges, |180however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment

right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.[16]

Because we hold that the Maine police knowingly circumvented Moulton's right to have counsel present at a confrontation between Moulton and a police agent, the fact that the police had additional reasons for recording Moulton's meeting with Colson is irrelevant. The decision of the Supreme Judicial Court of Maine is affirmed.

*It is so ordered.*

|181Chief Justice BURGER, with whom Justice WHITE and Justice REHNQUIST join, and with whom Justice O'CONNOR joins as to Parts I and III, dissenting.

Today the Court holds that the Sixth Amendment prohibits the use at trial of postindictment statements made to a government informant, even where those statements were recorded as part of a

---

15. In his brief, the Solicitor General assumes that the only claim made by the Government and answered by the Court in *Massiah* was that the Government was engaged in a continuing investigation of crimes as to which charges were already pending. He concedes that this was an inadequate justification which "had the flavor of a post hoc rationalization of conduct that, at its inception, in fact had as a primary purpose the obtaining of evidence for use at trial on the pending charges." Brief for United States as Amicus Curiae 23–24. So saying, he asks us to distinguish from that justification the justification that law enforcement officials are investigating "separate" crimes. In *Massiah*, however, the Government's assertion was that it needed to continue its investigation in order to discover the identities of Massiah's intended buyer and of others who were importing narcotics as well as to find additional evidence of Massiah's crimes. Brief for United States in *Massiah v.*

*United States*, O.T. 1963, No. 199, pp. 26–27. The Court in *Massiah* was thus faced with the very same argument made by the Solicitor General in this case. Even were the Solicitor General's characterization of the issue posed in *Massiah* correct, however, we would not draw the distinction he asks us to make. The likelihood of *post hoc* rationalizing is the same whether police claim to be investigating other examples of the same crime or some allegedly "separate" crime. We take what we feel is a more realistic view of police investigations, and instead accept that dual purposes may exist whenever police have more than one reason to investigate someone.

16. Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.