**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **UNITES STATES OF AMERICA, :** | **CASE NO. 00-6334** |
| : | **CR-FERGUSON** |
| **Plaintiff,** : | |
| vs. : | **Fla. Bar No. 100025** |
| : | **Fla. Bar No. 525693** |
| **LOUIS FRANK PETRILLO,** : | |
| : | |
| **Defendant.** : | |
| _____ : | |

### Defendant Petrillo's Motion To Dismiss

Defendant, Louis Frank Petrillo, by counsel, moves to dismiss the Indictment against him, pursuant to Rule(s) 12(b)(1)(2), Fed.R.Crim.P., due to (1) Defects in the institution of the Indictment; (2) Defenses and Objections to the Indictment; (3) Insufficiency of the Indictment for failure to charge essential elements required for conviction of the crime charged.

---

### Request For Hearing

Defendant, respectfully, requests Hearing on the Motion. *See United States v. Covington,* 395 U.S. 57, 60, 89 S.Ct. 1559, 1560-61 (1969), *United States v. Coia,* 719 F.2d 1120 (11th Cir. 1983). *See also, United States v. Alford,* 516 F.2d 942, 945 (5th Cir. 1975).

### Core Issue

**As A Matter Of Law, Defendant Can Not**
**Be Convicted Of Violating 18 USC 1503 And Is**
**Entitled To Pre-Trial Dismissal Of The Indictment**

The Government's statement of facts which it intends to prove at trial, was stated on the Record by AUSA Robert J Lehner, at Defendant's December 4, 2000 Bond Hearing. DE 17 [Transcript of Bond Hearing, pp. 1- 48]    For purposes of this Motion, the defense accepts, *arguendo,* the Government's version of facts, which are reproduced, *infra.*. DE 17

In essence, as shown the October 19 and 26, 2000, audio-videotapes; *Tapes,* Defendant Petrillo and his employer, [*also* secret, undercover agent] Lawrence Pinkoff met and discussed, *inter alia,* creation of documents, including a "backdated" promissory note/line of credit memorializing various "loans' from Golden Isles Pharmaceutical, Inc., Pinkoff's company, which the Government believes were not loans received by Petrillo as part of his compensation package or otherwise, but were a type of income to Petrillo required to be reported on his monthly probation reports. At the October 26, 2000 meeting, Petrillo and Pinkoff created a "back-dated" promissory note/line of credit with attached draw requests, memorializing these past transactions. Pinkoff typed the note on a computer. *Tapes.* The October 19 and 26, 2000 meetings were audio-videotaped and the tape of the October 26, 2000 meeting shows the note/line of credit being created. Petrillo took a copy of the note when he left the meeting and Pinkoff kept the original. A copy of the "note" found its way to the third, November 27, 2000, investigation/meeting, at AUSA Robert Lehner's office, ostensibly, to discuss Petrillo's upcoming Probation Violation Hearing to be held on December 4, 2000. AUSA Lehner, Investigator Louis Sellars, Ruben Oliva, Esq., Petrillo's attorney, and Stanley Foodman, a CPA hired by Ruben Oliva, Esq. attended the meeting. Neither Petrillo or Pinkoff were there. AUSA Lehner has stated that the November 27, 2000 meeting concluded the investigation. *Infra.*

The facts upon which the indictment rests were, candidly, stated by AUSA Robert J. Lehner, to be as follows:    DE 17, Tr. pp. 11, 12

-3-

" ... Then on November 27, as shown in the indictment, another event occurred. Mr. Petrillo's ... Mr. Petrillo's attorneys ... attorney rather, Rubin Oliva and Mr. Oliva's forensic accountant, Mr. Foodman, F O O D M A N, appeared in our offices, the U.S. Attorney's office in Miami, and with Mr. Sellars, who is here in court with me, and we met with Mr. Oliva and Mr. Foodman. Mr. Sellars is a financial auditor with the economic crime section of the U.S. Attorneys office in Miami.

At that time, the very documents, some of the very documents that were seen on the audio/video surveillance of October 26th were submitted to Mr. Sellers and myself by Foodman, the forensic accountant, and Mr. Oliva, the defense attorney for Mr. Petrillo, urging us to believe that these monies that we knew from — from bank records and from an interview with Mr. Pinkoff were income to Mr. Petrillo.

Mr. Foodman and Mr. Oliva urged us to believe that these were just loans, and that the bank records showing monies going into Mr. Petrillo's bank account were not income to him and that he, Mr. Petrillo, was being truthful with the probation officer when he said that his income was only $50,000 a year.

Instead, we have this promissory note and these lines of — line of credit, the draw requests, the promissory note being for $300,000 allegedly drawn up on November 1st of 1998, by Mr. Petrillo and Mr. ---and Mr. Pinkoff. But as we see in the audio and visual surveillance of October the 26th of this year they were actually drawn upon on computer right in front of the viewers, the audio/visual viewers, that you could be , if you wish to see this audio and video, that these documents were drawn up on "November the 27th" of this year .." Tr. 11, 12 [Mr. Lehner, presumably, meant to say "drawn up on "October 26th" of this year]

-4-

AUSA Lehner and an associate AUSA also confirmed, in a signed writing, that Petrillo's lawyer or an accountant working for the lawyer, showed the "note" to AUSA Lehner or an investigator, at the November 27, 2000 undercover investigation, which Petrillo did not attend.

> "...on November 27, 2000, Petrillo's attorney, Rubin Oliva, Esq. and a forensic accountant met with AUSA Lehner at his office and produced some of the backdated documents in order to convince the United States Attorney's Office that a substantial amount of monies and funds that had been received by Petrillo were loans rather than income .." DE 19 \ 1

It is also shown, of Record, that no judge has seen the "note" .. it was never filed or used, by the Defendant or his lawyer for any purpose, in any judicial proceeding. No decision had been made by Petrillo's attorney to use the documents in any pending judicial proceeding. DE 49 And, it is undisputed that Defendant Petrillo was not at the November 27, 2000 meeting where the Government states a copy of the "note" was provided to Agent(s) Sellars and Lehner. DE 1 -end.

For purposes of this Motion, only, it will be assumed, *arguendo,* that the document referred to by AUSA Lehner are "false" and AUSA Lehner's statements are true and provable at trial.

\1 AUSA Lehner is also prosecuting Petrillo for probation violation arising from a former plea to bank fraud On July 21, 2000, Petrillo was charged with four violations of standard conditions of probation in Case No. 93-442 Cr-Atkins/Zloch; one for allegedly "sleeping out" on several nights during authorized business trips to Orlando, Florida, when he should have slept at the Ramada Inn; and, three other violations, which appear to question how Petrillo's compensation package should have been reported on monthly probation forms. Hearing on the violations was last set for Monday, December 4, 2000, before the Hon. William J. Zloch. After Petrillo's arrest, *sub judice,* on Friday, December 1, 2000, the Probation Violation Hearing was canceled and re-set to February 26, 2000, and a fifth Violation, 'Obstruction of Justice' was added; because Petrillo's attorney or an accountant showed a " note" to AUSA Lehner or investigator Sellars at the November 27, 2000 investigative meeting which the Government believed to be false. On February 16, 2001, Judge Zloch entered an Order Continuing the Probation Violation Hearing until conclusion of Case No. 00-Cr-6334-Ferguson, the case, *sub judice.* Petrillo's five year probation ended on February 23, 2001.

-5-

**(B)  Legal Argument - Memorandum of law**

**(1)  Summary of Argument**

(a)    Based on the face of the Indictment, the Government's statement of facts already of Record, and applicable law; *See United States v. Aguilar,* 115 S.Ct. 2357 (1995) *and ; United States v. Vaghela,* 169 F.3d 729 (11th Cir. 1999) , it is clear that Defendant has not committed, and can not be charged with or convicted of any violation of 18 U.S.C. 1503. There is fatal variance between the Indictment and the Government's stated proofs of record; and even if the statement of facts is proven at trial, the proofs are insufficient for conviction, since the Supreme Court restricted the range and scope of 18 U.S.C. 1503 in *United States v. Aguilar, supra,* 115 S.Ct. 2357 (1995), which held; that providing a "false document" or "false statement" in a proceeding ancillary to a pending judicial proceeding ... is no longer a violation of 18 U.S.C. 1503. This is so, even if the accused knew of the pending judicial proceeding.    *Aguilar* effectively overruled all pre 1995 18 U.S.C.1503 cases, which had applied the former, looser, standards. *See Aguilar, supra, at 2363*

> "Because respondent knew of the pending proceeding, the Government
> therefore contends that Aguilar's [false] statements are analogous to those
> made directly to the grand jury itself in the form of testimony or false
> documents. ... We think the transcript citation relied upon by the Government
> would not enable a rational trier of fact to conclude that respondent knew
> that his false statement would be provided to the grand jury, and that the
> evidence goes no further than showing that respondent testified falsely to
> an investigating agent.  Such conduct, we believe, falls on the other side of
> of the statutory line from one who delivers false documents to the grand jury
> itself.  Conduct of the latter sort all but assures that the grand jury will consider
> the material in its deliberations.  But what use will be made of false testimony

-6-

given to an investigative agent who has not been subpoenaed or otherwise
directed to appear before the grand jury is far more speculative. We think it
can not be said to have the "natural and probable effect" of interfering with the
due administration of justice." *U. S. v. Aguilar*, 115 S Ct. 2357 (1995), *at 2363*

In *United States v. Vaghela*, 169 F.2d 729 (11ᵗʰ Cir 1999), the Eleventh Circuit, applying
*Aguilar, supra*, held that, since *Aguilar*, using a "false" document in an a proceeding ancillary to the
actual judicial proceeding is not sufficient to convict under 18 U.S.C. 1503.

> " ...The action taken by the accused must be with an intent to influence
> judicial or grand jury proceedings, it is not enough that there be an intent
> to influence some ancillary proceeding, such as an investigation
> independent of the court's or grand jury's authority...
> "As we saw in Aguilar, the defendant also sought to hide his wrongdoing
> by lying to federal agents. See Aguilar, 515 U.S. at 596-97. Yet,
> notwithstanding that a grand jury had already begun its investigation
> into that case, the Supreme Court found that the connection between
> Aguilar's false testimony at the time it was given and its effect on the
> judicial proceedings in question was too speculative to support the
> conclusion that it would have "the natural and probable effect of
> interfering with the due administration of justice" because, as we have
> seen, his conviction was reversed and therefore the act he would have
> conspired to commit would not under Aguilar be itself illegal
> This is precisely the case we have here. Vaghela and Desai
> certainly agreed to stick with a contract they knew to be false.
> But if drawing up and asserting the veracity of a false document
> would not in itself ground a substantive charge of obstruction - and it is clear

-7-

that it would not do so under Aguilar, which required that "the act must have
a relationship in time, causation, or logic with the judicial proceedings,
'Aguilar. 515 U.S. at 599 - their agreement to do so cannot ground a
conspiracy charge based on that same offense...."

" ...The action taken by the accused must be with an intent to influence
judicial or grand jury proceedings, it is not enough that there be an intent
to influence some ancillary proceeding, such as an investigation
independent of the court's or gand jury's authority ... "

In summary, both the United States Supreme Court and the Eleventh Circuit, agree that the
Governments statement of fact, upon which the Government bases the Indictment and prosecution
of Petrillo, is legally insufficient to charge or convict Petrillo of violating 18 U.S.C. 1503. On this
basis, the Court can dismiss the Indictment, pre-trial.

   **(2)**      **Argument**

**Issue**

### As A Matter Of Law, Defendant Can Not Be Convicted Of Violating 18 U.S.C. 1503, Assuming, Arguendo, The Government's Statement Of Facts Is Correct And Can Be Proved At Trial

On the facts stated by the United States, of Record, *sub judice,* Petrillo can not, under any view
of those facts, be convicted by a rational jury of violating 18 USC 1503, nor does the Indictment
charge essential elements for violation of 18 USC 1503, since it can not charge Petrillo with knowing
the questioned document(s) would be used in a judicial proceeding, even assuming, *arguendo,* the
falsity of the document(s) *and assuming, arguendo, the truth of the Government's statement of
facts of record, sub judice. It is axiomatic that the Government can not change the facts of
record at time of trial and there is no bar to pre-trial disposition of this cause.*

-8-

Since the seminal, 1995, decision in *United States v. Aguilar, supra,* the United States Supreme Court and the Eleventh Circuit Court of Appeals have held that prior cases permitting convictions under 18 USC 1503 under the considerably more lax, pre-*Aguilar* standards, were erroneously used to support convictions under 18 USC 1503

In *United States v. Aguilar, supra,* 115 S.Ct 2357 (1995), the United States Supreme Court specifically spoke to the core issue before the court, on remarkably similar facts; and which mirrors Defendant's argument and shows that the United States can no longer make a quantum leap from the display of a false document or presenting false testimony to a government AUSA or Investigative Agent, pre-trial, to the conclusion that the Defendant will *also* endeavor to use the document or false testimony at the Hearing or Trial, merely because the Defendant knows of the pending proceeding.

Presenting a false document or false testimony to an Agent of the United States and endeavoring to use a false document or testimony at Hearing or Trial, are *not* analogous or synonymous. And, the Government can no longer rely on the "reasonable assumption" the document will be used; or argue at trial that it is "foreseeable " that the false document or testimony would be presented at the Hearing or Trial. *Aguilar* overrules and precludes such speculative assumptions. *Id.*

> "Because respondent knew of the pending proceeding, the Government
> therefore contends that Aguilar's [false] statements are analogous to those
> made directly to the grand jury itself in the form of testimony or false
> documents 2/ We think the transcript citation relied upon by the Government
> would not enable a rational trier of fact to conclude that respondent knew
> that his false statement would be provided to the grand jury, and that the
> evidence goes no further than showing that respondent testified falsely to
> an investigating agent. Such conduct, we believe, falls on the other side of
> of the statutory line from one who delivers false documents to the grand jury

itself. Conduct of the latter sort all but assures that the grand jury will consider
the material in its deliberations. But what use will be made of false testimony
given to an investigative agent who has not been subpoenaed or otherwise
directed to appear before the grand jury is far more speculative. We think it
can not be said to have the "natural and probable effect" of interfering with the
due administration of justice." *United States v. Aguilar, supra,* (1995), *at 2363*

Since Ruben Oliva, Esq., Petrillo's attorney, had made no decision to use the document as
of November 27, 2000, DE 49, ... and ... Petrillo did not attend the November 27, 2000 meeting, and
AUSA Lehner and Agent Sellars knew this ... it is unclear under what theory AUSA Lehner was
proceeding when he concluded that all essential elements of an 18 USC 1503 violation had occurred
and Indicted Petrillo on November 30, 2000. DE 3

In fact, AUSA Lehner has, quite candidly, stated the facts upon which he based the
Indictment, on the record, at Defendant's Bond Hearing, and, the "facts" are legally insufficient for
Indictment or conviction. DE 17 *Infra*

Responding to the query why, after the October 26, 2000 taping, Petrillo had not been
arrested, if he believed the October 26, 2000 tape proved with certainty, the "false" documents
would be used in a judicial proceeding; AUSA Lehner stated that the investigation (sic) was not
brought to a conclusion until the November 27, 2000 "meeting", [ when Petrillo's counsel, Ruben
Oliva, Esq. and/or a CPA working for him, allegedly gave a copy of the questioned document to
AUSA Lehner or Investigator Sellars] D 17

"...Counsel is suggesting that once we have some evidence of corruptly
endeavoring to influence, obstruct and impede justice that should be
the conclusion of the investigation. *(sic)* Obviously, we carried it forward
to its conclusion and we showed through the investigation *(sic)* that the
defendant did intend to obstruct justice by using his attorney and
forensic accountant to bring these false fictitious documents to us ..."(*sic*)

-10-

*But, see United States v. Aguilar, supra, at* 2363, holding such facts insufficient for indictment or conviction   "But what use will be made of false testimony given to an investigative agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative   We think it can not be said to have the "natural and probable effect" of interfering with the due administration of justice."

And here, AUSA Lehner and Agent Sellars, who were involved in all three (3) investigations/meetings, *supra,* believed, from October 26, 2000, when they were drawn up, that the documents were false. Hence, neither of them would be "misled" by the documents and certainly would not use them to "mislead" the Judge in any judicial proceeding, even if someone had subpoenaed either of them to a Hearing, which was *not* done.   Petrillo's attorney, Ruben Oliva, Esq., made no decision to use them in any judicial proceeding DE 49.   Yet, Petrillo was indicted on Thursday, November 30, 2000, arrested on Friday, December 1, 2000 and the only "judicial proceeding" was the Hearing scheduled for Monday, December 4, 2000   Thus, AUSA Lehner could only have "speculated" that Petrillo would endeavor to use the "note" at the December 4, 2000 Hearing.   *Aguilar* and *Vaghela ...specifically prohibit indictment or conviction on this basis.*

Certainly, if either Petrillo or his attorney did endeavor to use the "note" in the December 4, 2000 Hearing ... AUSA Lehner would have objected... on the basis that the document was "false", and a different scenario would have been presented.   But this is not what happened.

The precise legal point was made by the Eleventh Circuit, in *United States v. Vaghela,* 169 F.2d 729 (11th Cir. 1999).   In *Vaghela,* the Eleventh Circuit *reversed* the District Court convictions for violation of 18 U.S.C. 1503, in a "false document" case, since the conviction was based upon the broader, *'catch-all'*, pre-*Aguilar* reach of 18 U.S.C. 1503, formerly applied in the Southern District and elsewhere, which permitted indictment on *speculation, which is not permitted, post Aguilar.*

-11-

"Some time later, Desai was interviewed by federal agents. Subsequently,
in December, 1995, Desai called Vaghela to discuss strategy. Vaghela
told him to "stick with the contract". On January 31, 1996, a federal
grand jury subpoenaed records from Desai. Desai produced the back-
dated contract and copies of checks he had given Vaghela. Before
producing the checks he had given Vaghela, Desai altered them,
adding a memo showing that they were paid in exchange for consulting
work. Desai also produced 1099 forms stating that Desai had employed
Vaghela as a consultant in 1993 and 1994"

In holding that the production of the false, back-dated, documents to the federal agents, was
*no longer sufficient, as a matter of law* ... to charge or convict the defendants of an 18 U.S.C.
1503 violation ... under the significantly restricted reach of 18 U.S.C. 1503 ... after *Aguilar* ... the
Eleventh Circuit *reversed* the convictions of Vaghela and Desai ... for producing false, back-dated,
documents to federal agents in an ancillary proceeding ... but not actually using or endeavoring to
use them in an actual a judicial proceeding or grand jury proceeding, explaining:

" In a broad and colloquial sense, every criminal act is an obstruction
of justice, as is every effort to conceal that criminal act. However, as
we noted earlier, such a broad and literal reading of the definition of this
criminal offense is inconsistent with Aguilar. See Aguilar, 515 U.S. at 599
("The action taken by the accused must be with an intent to influence
judicial or grand jury proceedings, it is not enough that there be an intent
to influence some ancillary proceeding, such as an investigation
independent of the court's or grand jury's authority.") While Vaghela's
efforts to camouflage his own criminal conduct is far from praiseworthy,
it would be stretching the language of Sec. 1503 well beyond its intended
purpose of 'preserving the integrity of a judicial proceeding', United States

-12-

v. Veal, 153 F.3d 1233, 1250 (11ᵗʰ Cir. 1998), to allow the act of hiding incriminating evidence to serve as the basis for a conspiracy to obstruct justice." ...

"Vaghela and Desai certainly agreed to stick with a contract they knew to be false  But if drawing up and asserting the veracity of a false document would not in itself ground a substantive charge of obstruction  - and it is clear that it would not do so under Aguilar, which required that "the act must have a relationship in time, causation, or logic with the judicial proceedings, 'Aguilar, 515 U S. at 599 - their agreement to do so cannot ground a conspiracy charge based on that same offense ..."

Under the teaching of the Supreme Court in *Aguilar, supra,* and the Eleventh Circuit in *Vaghela, supra,* the AUSA's speculation that he could prove, at trial, beyond a reasonable doubt, that the documents in question would actually be used in the judicial proceeding ... is not sufficient, as a matter of law, for Indictment or conviction.   This so because it is only the AUSA's "speculation" and could only be a jury's "speculation". *Id.*

If such loose  Governmental conduct were permitted, Indictment or conviction on "speculation" and hunches, no matter how well intentioned ...the Supreme Court's teaching in *Aguilar,* which we must accept, would be meaningless. *Id.*

In an earlier pleading, filed Friday, December 1, 2000, another AUSA, Donald Chase, who signed the document for AUSA Lehner, stated the Government's theory for Indictment and ultimate conviction of Petrillo somewhat differently; to the effect that the violation actually occurred on October 26, 2000, when Government Agent Pinkoff actually typed up the documents, to wit: DE 19

"On October 26, 2000, while under audio/video surveillance by the
Federal Bureau of Investigation, defendant Petrillo created, and caused
the creation of, back-dated false and fictitious documents, including a
Promissory Note/Line of Credit and Line of Credit Draw Requests,
in order to mislead the Court into believing at the December 4, 2000
Violation of Conditions of Probation Hearing that moneys and funds
that had been received by defendant Petrillo were loans rather than income " DE 19

But, this theory, upon which the Government proceeds, is ***specifically barred and rendered***
***insufficient*** ... by *the Eleventh Circuit's decision in Vaghela, supra,* from doing so, to wit;

" But if drawing up and asserting the veracity of a false document
would not in itself ground a substantive charge of obstruction  - and it is clear
that it would not do so under Aguilar, which required that "the act must have
a relationship in time, causation, or logic with the judicial proceedings,
'Aguilar, 515 U S. at 599 - their agreement to do so cannot ground a
conspiracy charge based on that same offense... "

Of course, since Pinkoff was a federally immunized, undercover, informant, agent, Petrillo
could not be charged with conspiring with Pinkoff, and *post Aguilar - Vaghela,* the mere creation of
the "note" can not be the basis for a charge or conviction of violating 18 U.S.C. 1503

And, in the same December 1, 2000 pleading, the Government stated that production of the
"note" at the [third] November 27, 2000 investigation, was merely an attempt by Petrillo's lawyer
to mislead the United States Attorney's Office. There was no mention of "misleading a judge", nor
does the Government make that charge against Petrillo. Nor could the charge be made against by
Petrillo, since he was not even at the "meeting" and his attorney certainly had made no decision to
use the "note" for any purpose in any judicial proceeding. DE 49

-14-

"On November 27, 2000, defendant Petrillo's attorney, Ruben Oliva,
and a forensic accountant also appearing for defendant Petrillo met the
undersigned Assistant United States Attorney and a United States Attorney's
Office financial auditor at the United States Attorney's Office and produced
some of the back-dated documents referred to in paragraph 5, above, in order to
convince the United States Attorney's Office that a substantial amount of moneys
and funds that had been received by defendant Petrillo were loans rather than income."

Of course, attempting to mislead a United States Attorney, even if true, is not the same as
attempting to misleading a United States, article III, District Judge. *See Aguilar, supra.* And, there
is no hint in the AUSA's December 1, 2000, signed statement, that anyone used the November 27,
2000 investigation/meeting to mislead a Judge in a presiding judicial proceeding. Nor could they,
since Petrillo's attorney had not even decided whether or not to use the "note" for any purpose, DE
49, and Petrillo was not even at the meeting.

Thus, we see. based upon the same facts, the Government, in its Indictment, attempts to
advances two different theories for conviction, by the device of "spreading" the time of the offense
... from October 26, 2000 to November 27, 2000.   But, based on the record facts, which the
Government can not now change, neither theory permits indictment, trial or conviction of Petrillo.

Since AUSA Lehner, in his signed, December 1, 2000 pleading, stated, quite clearly, that
the October 26, 2000 meeting was the end of the investigation as to Petrillo's efforts to "mislead"
the Judge ... the balance of the "investigation" must have concerned other matters or was only
ancillary to the October 26, 2000 determination to indict Petrillo. Perhaps hoping to supply proofs
which, facially, are lacking from the events of October 26, 2000.

-15-

"...Counsel is suggesting that once we have some evidence of corruptly
endeavoring to influence, obstruct and impede justice that should be
the conclusion of the investigation *(sic)* Obviously, we carried it forward
to its conclusion and we showed through the investigation *(sic)* that the
defendant did intend to obstruct justice *by using his attorney and
forensic accountant to bring these false and fictitious documents
to us..." (emph. supp.) (sic).* DE 17 [Tr. 11, 12]

However, under either of the Government's theories, 18 USC 1503 was not violated:

(1) The Government's theory that an 18 USC 1503 violation occurred when "Petrillo created
the note" (sic) and undercover Agent Pinkoff c typed up the note on his computer and gave a copy
to Petrillo ... is facially barred by *Aguilar - Vaghela.*

(2) The Government's theory that an 18 USC 1503 violation occurred when Ruben Oliva,
Esq. or accountant, Foodman, produced a copy of the note to AUSA Lehner or Agent Sellars, to
mislead them, which no decision had been made to use in a judicial proceeding, is facially barred by
*Aguilar-Vaghela..*

"Because respondent knew of the pending proceeding, the Government
therefore contends that Aguilar's [false] statements are analogous to those
made directly to the grand jury itself in the form of testimony or false
documents. 2/ We think the transcript citation relied upon by the Government
would not enable a rational trier of fact to conclude that respondent knew
that his false statement would be provided to the grand jury, and that the
evidence goes no further than showing that respondent testified falsely to
an investigating agent. Such conduct, we believe, falls on the other side of
of the statutory line from one who delivers false documents to the grand jury
itself. Conduct of the latter sort all but assures that the grand jury will consider

-16-

the material in its deliberations. But what use will be made of false testimony given to an investigative agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative. We think it can not be said to have the "natural and probable effect" of interfering with the due administration of justice." *United States v. Aguilar, supra,* 115 S.Ct. 2357 (1995), *at 2363*

No violation of 18 U.S.C. 1503 was committed by Petrillo ... or his attorney ... or the attorney's accountant ... or anyone else, since producing an [assumed] "false document" to an AUSA and/or Investigator in a criminal investigation or other non-judicial activity, which is only ancillary to the judicial proceeding itself, is not a violation of 18 USC 1503 ... since the ancillary proceeding is not a "judicial or grand jury proceeding", as required by 18 U.S.C. 1503, post -*Aguilar-Vaghela.*

Respectfully, based upon the statement of facts which the Government has placed of Record, and assuming, *arguendo,* for purposes of this motion, the Government's statement of facts are true, it is clear, beyond argument, that the Government can present no set of facts, at trial, on either of its stated theories of record, or the statement of facts of record ... upon which a rational jury could convict Petrillo of violation of 18 USC 1503. The Indictment should be dismissed as facially and otherwise insufficient, should the Government decline to seek dismissal from the Court.

## C.                              Conclusion

On the face of the Indictment, the Government's stated facts of record and remarkably similar fact situations, *sub judice,* as appear in *Aguilar* and Vaghela, the Indictment of Petrillo was speculative and improvidently returned. Facially and substantively, the Indictment and proofs of record demonstrate that Petrillo, as a matter of law, can not be convicted of violating 18 U.S.C. 1503 on the Governments Indictment and evidence of Record

-17-

**D.**                                    **Certificate Of Good Faith**

Undersigned counsel has conferred with AUSA Robert Lehner on different occasions, per the

local rule, and he does not wish to voluntarily request dismissal of the Indictment, on any basis.

Hence, this motion to dismiss was prepared  and should  be brought to Hearing

Respectfully Submitted.

Law Office of Joseph S. Paglino
Lead Counsel for Defendant
12865 West Dixie Highway
North Miami, Florida 33161
Tel. (305) 758-8017

And

Law Office of Walter A. Reynoso
Co-Counsel for Defendant
Grove Forest Plaza
2937 S W. 27th Avenue, Suite 107
Coconut Grove, Florida 33133
Tel. (305) 642-8961

By_____
Joseph S. Paglino, Esq.

**E.**                                    **Certificate of Service**

IT IS HEREBY CERTIFIED that a true copy of the foregoing was furnished by mail to

Robert J. Lehner, AUSA, 99 N.E. 4th Street, 4th Floor, Miami, Florida 33132-2111, this ___ day of

February, 2001.

_____
Joseph S. Paglino, Esq.

-18-



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**0.0. ̄NO.  6 3 3 4  CR-FERGUSON**
18 U.S.C. §1503

MAGISTRATE JUDGE
SNOW

FILED BY
00 NOV 30 PM 2: 14
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

UNITED STATES OF AMERICA            )
                                    )
v.                                  )
                                    )
LOUIS F. PETRILLO,                  )
                                    )
            Defendant.              )
_____)

### INDICTMENT

#### COUNT 1

From on or about October 26, 2000, through on or about November 27, 2000, at Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, defendant

#### LOUIS F. PETRILLO

corruptly endeavored to influence, obstruct, and impede the due administration of justice in <u>United States v. Louis F. Petrillo</u>, Case No. 93-442-CR-ZLOCH, in a Violation of Conditions of Probation judicial proceeding pending in the United States District Court, Southern District of Florida, by creating, and causing the creation of, false and fictitious documents, that is, a Promissory Note/Line of Credit and Line of Credit Draw Requests, in order to mislead the United States District Judge, who is presiding over the judicial

proceeding referenced above, into believing that moneys and funds

that had been received by defendant Louis F. Petrillo were loans

rather than income.

    All in violation of Title 18, United States Code, Section

1503.

A TRUE BILL

FOREPERSON

GUY A. LEWIS

UNITED STATES ATTORNEY

ROBERT J. LEHNER

ASSISTANT UNITED STATES ATTORNEY

DEFENDANT'S
EXHIBIT

CASE
NO. 00-cr-6334

EXHIBIT
NO.    1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 93-442-CR-ZLOCH

UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )
                                     )
LOUIS F. PETRILLO,                   )
                                     )
        Defendant.                   )
_____)

## MOTION TO CONTINUE VIOLATION OF
## CONDITION OF PROBATION HEARING

The United States of America, by and through its undersigned
Assistant United States Attorney, hereby moves that the Violation
of Conditions of Probation Hearing in the above-captioned case
scheduled for December 4, 2000, be continued, and states as
follows:

1.    On August 3, 2000, United States Probation Officer Frank
X. Will, who is assigned to supervise defendant Louis F. Petrillo
in the above-captioned case, submitted to the Court a Petition,
requesting that the Court authorize the arrest of defendant
Petrillo for violations of the conditions of probation, based,
inter alia, upon defendant Petrillo's failing to report to the
United States Probation Office large amounts of his income.

2.    On August 8, 2000, the Court ordered the issuance of an
arrest warrant based upon Probation Officer Will's petition.

3.    On August 16, 2000, defendant Petrillo was arrested on

the arrest warrant, made his initial appearance before Un :ed States Magistrate Judge William C. Turnoff, and was release:¹ ɔon a $250,000 10% bond.

4.    The Violation of Conditions of Probation Hearing has been scheduled for December 4, 2000.

5.    On October 26, 2000, while under audio/video surveillance by the Federal Bureau of Investigation, defendant Petrillo created, and caused the creation of, back-dated false and fictitious documents, including a Promissory Note/Line of Credit and Line of Credit Draw Requests, in order to mislead the Court into believing at the December 4, 2000 Violation of Conditions of Probation Hearing that moneys and funds that had been received by defendant Petrillo were loans rather than income.

6.    On November 27, 2000, defendant Petrillo's attorney, Ruben Oliva, and a forensic accountant also appearing for defendant Petrillo met the undersigned Assistant United States Attorney and a United States Attorney's Office financial auditor at the United States Attorney's Office and produced some of the back-dated documents referred to in paragraph 5, above, in order to convince the United States Attorney's Office that a substantial amount of moneys and funds that had been received by defendant Petrillo were loans rather than income.

7.    On November 30, 2000, a federal grand jury, sitting in Miami, indicted defendant Petrillo for Obstruction of Justice, in

2 .

violation of 18 U.S.C. §1503, involving the events described above. See attached Indictment in Case No. 00-6334-CR-FERGUSON.

8.    On December 1, 2000, defendant Petrillo was arrested upon an arrest warrant issued on November 30, 2000 by United States Magistrate Judge Stephen T. Brown upon the grand jury indictment.

9.    Ruben Oliva, Esq., has been informed that he will be a witness in the trial of the attached indictment.

10.    The United States Probation Office is in the process of amending the probation violation petition to include as a violation of probation the matter charged in the attached indictment. Accordingly, Ruben Oliva, Esq., will be a witness in the violation of probation hearing pending before the Court.

11.    In light of the events described above, it is hereby moved that the violation of probation hearing scheduled for December 4, 2000, be continued.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____ FOR
ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
FLORIDA BAR NO. 0861669
99 N.E. 4th Street, 4th Floor
Miami, Florida 33132-2111
Tel. No. (305) 961-9020
Fax No. (305) 530-6168

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by mail this 1ST day of December, 2000 to Ruben Oliva, Esq., 2250 S.W. 3rd Avenue, Third Floor, Miami, Florida 33129.

Donald F. Chase II FOR

ROBERT J. LEHNER
ASSISTANT U.S. ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 93-0442-CR-ZLOCH

UNITED STATES OF AMERICA

    Plaintiff

    V.

LOUIS F. PETRILLO

    Defendant

ORDER



FILED by _____ D.C.

FEB 1 6 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

THIS MATTER is before the Court upon Defendant's Motion For A Continuance (filed February 13, 2001). The Court having reviewed the Court file and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the aforementioned motion is hereby GRANTED. Final Probation Violation Hearing will be reset by further order of the Court upon the notification by the United States Attorney's Office of the conclusion of Case No. 00-6334-CR-Ferguson.

DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this ___16th___ day of February, 2001.

WILLIAM J. ZLOCH
Chief United States District Judge

cc:

Robert Lehner, Esq., AUSA
Ruben Oliva, Esq.
Walter Reynoso, Esq.
Probation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6334-CR-FERGUSON

UNITES STATES OF AMERICA,

        **Plaintiff,**

vs.

                                  **ORDER**

LOUIS FRANK PETRILLO,

        **Defendant.**

_____

      This MATTER is before the Court upon Defendant's Motion To Dismiss.  The Court

having reviewed the Court file and being otherwise duly advised in the premises, it is

      ORDERED AND ADJUDGED that the aforementioned motion is hereby GRANTED and

this cause is dismissed.

      .DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this

_____ day of _____, 2001.


                                   _____
                                   WILKIE D. FERGUSON, JR.
                                   United Sates District Judge

cc:

Robert Lehner, Esq. AUSA
Joseph Paglino, Esq.
Walter Reynoso, Esq.



U.S. Department of Justice

*United States Attorney*
*Southern District of Florida*

Robert J. Lehner
Assistant United States Attorney
Economic Crimes Section
*99 N.E. Fourth Street,Suite 400, Miami, Florida 33132-2111*
*Ph.(305) 961-9001 / Fx. (305) 530-6168*
E-mail aflt01.po.rlehner@usdoj.gov

October 2, 2000

Mr. Lawrence D. Pinkoff

Dear Mr. Pinkoff:

It is my understanding that you, Lawrence D. Pinkoff, are agreeable to speaking with representatives of the United States government. Specifically, you have agreed to be interviewed by agents and attorneys of the United States government and to testify truthfully and completely during any grand jury and court proceedings. You understand that you must at all times give complete, truthful and accurate information and testimony.

In order to assure that there is no misunderstanding concerning the procedures to be followed in regard to your statements given today and in the future in furtherance of your cooperation with the government, this letter will clarify the ground rules.

First, no statements made by you today and in the future in furtherance of your cooperation with the government will be offered in evidence against you or used as investigative leads against you in any criminal case, except for cases involving crimes of violence

Second, in the event you are a witness at any trial or other legal proceedings relating to any matter discussed by you today and in the future in furtherance of your cooperation with the government and you offer testimony different from any statement made or other information provided by you, the attorney for the prosecution may cross-examine you and introduce rebuttal

EXHIBIT

2

evidence using any statements made or other information provided by you as well as all evidence
derived directly or indirectly therefrom.

Very truly yours,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:

Robert J. Lehner
Assistant United States Attorney
Southern District of Florida

I have read this letter and I understand and agree to the conditions set forth in the letter.

LAWRENCE D. PINKOFF

10/2/00

Date

WITNESS:    ANDREW COTZIN, Esq.
Attorney for LAWRENCE D. PINKOFF

10/2/00

Date

against enjoining pending state criminal proceedings applies to granting of declaratory relief). Declaratory relief in state tax cases might throw tax administration "into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law." *Perez v. Ledesma*, 401 U.S. 82, 128, n. 17, 91 S.Ct. 674, 699, n. 17, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part). We simply do not read § 1983 to provide for injunctive or declaratory relief against a state tax, either in federal or state court, when an adequate legal remedy exists.[6]

[11] ₅₉₂Of course, nothing we say prevents a State from empowering its own courts to issue injunctions and declaratory judgments even when a legal remedy exists. Absent a valid federal prohibition, state courts are free to issue injunctions and declaratory judgments under *state* law. When a litigant seeks declaratory or injunctive relief against a state tax, pursuant to § 1983, however, state courts, like their federal counterparts, must refrain from granting federal relief under § 1983 when there is an adequate legal remedy.

[12] Because petitioners had an adequate legal remedy, the Oklahoma courts could not have awarded either declaratory or injunctive relief against the state taxes under § 1983. It follows that when no relief can be awarded pursuant to § 1983, no attorney's fees can be awarded under § 1988. Accordingly, the judgment of the Oklahoma Supreme Court is

*Affirmed.*

Justice KENNEDY, concurring.

One reason for difficulty in adapting 42 U.S.C. § 1983 to an action attacking a state tax is, in my view, that § 1983 was not

intended for claims based on the Commerce Clause at all. See *Dennis v. Higgins*, 498 U.S. 439, 451, 111 S.Ct. 865, 872–873, 112 L.Ed.2d 969 (1991) (KENNEDY, J., dissenting) (violations of the Commerce Clause do not give rise to a cause of action under § 1983); see also *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 117, 110 S.Ct. 444, 454, 107 L.Ed.2d 420 (1989) (KENNEDY, J., dissenting) (a federal statute's preemptive effect does not secure a right within the meaning of § 1983). The Court has not adopted that position, however, and on that premise I agree with today's opinion and join it in full.



515 U.S.. 593. 132 L.Ed.2d 2357

₅₉₃UNITED STATES, Petitioner,

v.

**Robert P. AGUILAR.**
No. 94–270.
Argued March 20, 1995.
Decided June 21, 1995.

Federal judge was convicted in the United States District Court for the Northern District of California, Louis Charles Bechtle, Chief Judge, sitting by designation, of disclosing wiretap information and endeavoring to obstruct justice. Judge appealed. On rehearing en banc, the Ninth Circuit Court of Appeals, 21 F.3d 1475, reversed. Certiorari was granted. The Supreme Court, Chief Justice Rehnquist, held that: (1) catchall

---

6. As our opinions reveal, there may be extraordinary circumstances under which injunctive or declaratory relief is available even when a legal remedy exists. For example, if the "enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, [or] throw a cloud upon the title," equity might be invoked. *Dows v. Chicago*, 11 Wall. 108, 110, 20 L.Ed. 65 (1871). As we have made clear, however, the multiplicity-of-suits rationale for permitting equitable relief extends only to those situations where there is a

real risk of "numerous suits between the same parties, involving the same issues of law or fact." *Matthews v. Rodgers*, 284 U.S. 521, 530, 52 S.Ct. 217, 221, 76 L.Ed. 447 (1932). Thus, if a state court awards a refund to a taxpayer on the ground that the tax violates the Federal Constitution, but state tax authorities continue to impose the unconstitutional tax, injunctive and declaratory relief might then be appropriate. In such circumstances, the remedy might be thought to be "inadequate."

provision of obstruction of justice statute required "nexus" in time, causation or logic between act and judicial proceedings; (2) judge's utterance of false statements to Federal Bureau of Investigation (FBI) agents was not endeavor to obstruct due administration of justice, absent evidence that judge knew statements would be provided to grand jury; and (3) statute prohibiting disclosure of wiretap information could apply to disclosure occurring after wiretap application expired or had been denied.

Affirmed in part, reversed in part, and remanded.

Justice Stevens filed an opinion concurring in part and dissenting in part.

Justice Scalia filed an opinion concurring in part and dissenting in part, in which Justices Kennedy and Thomas joined.

**1. Obstructing Justice ⟨⟩6**

Catchall provision of obstruction of justice statute requires "nexus" in time, causation or logic between act and judicial proceedings and, thus, uttering false statements to investigating agent who might or might not testify before grand jury is insufficient; false testimony to investigator who has not been subpoenaed to appear before grand jury would not have "natural and probable effect" of interfering with due administration of justice. 18 U.S.C.A. § 1503.

**2. Obstructing Justice ⟨⟩6**

Federal judge's utterance of false statements to Federal Bureau of Investigation (FBI) agents did not violate statute prohibiting endeavor to obstruct due administration of justice, absent evidence that judge knew that his false statements would be provided to grand jury; agents had not been subpoenaed or otherwise directed to appear before grand jury at time of judge's statements. 18 U.S.C.A. § 1503.

**3. Obstructing Justice ⟨⟩1**

Statute prohibiting "endeavor" to obstruct due administration of justice makes conduct punishable if defendant acts with intent to obstruct justice, even if he or she is foiled in some way, but use of term does not require criminal liability for any act done with intent to obstruct justice. 18 U.S.C.A. § 1503.

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Telecommunications ⟨⟩494.1**

Statute prohibiting disclosure of wiretaps refers to "possible interception" in order to criminalize disclosure of pending wiretap application or authorization even though defendant could not know whether it would result in actual interception and, thus, statute could apply to disclosure occurring after wiretap application or authorization has expired or been denied; offense is not limited to cases in which interception based upon application or authorization was factually possible. 18 U.S.C.A. § 2232(c).

> See publication Words and Phrases for other judicial constructions and definitions.

**5. Constitutional Law ⟨⟩90(1)**

Government may not generally restrict individuals from disclosing information that lawfully comes into their hands in absence of state interest of highest order. U.S.C.A. Const.Amend. 1.

**6. Constitutional Law ⟨⟩90.1(3)**

Protective orders may be imposed in connection with information acquired through civil discovery without violating First Amendment. U.S.C.A. Const.Amend. 1.

**7. Constitutional Law ⟨⟩90.1(1)**

Governmental restrictions on disclosure by one who voluntarily assumed duty of confidentiality are not subject to same stringent standards that would apply to efforts to impose restrictions on unwilling members of public. U.S.C.A. Const.Amend. 1.

**8. Constitutional Law ⟨⟩90.1(9)**
**Telecommunications ⟨⟩492**

Government's interest in maintaining secrecy of wiretaps justified interpretation of wiretap disclosure statute to prohibit disclosure of expired wiretap applications without any artificial narrowing of statute's scope due

to First Ame
Const.Amend.

Responden
District Judge,
closing a wiret
§ 2232(c), even
the particular w
disclosure was
Federal Burea
agents during a
also was convict
the due admin
§ 1503. The Co
convictions, reas
in each instanc
statutory langua

*Held:*

1. Uttering
vestigating agen
testify before a g
make out a viola
of "endeavor[ing
impede … the
tice." The "nexu
recent Courts of
the accused's act
time, causation,
judicial proceedir
tion of § 1503's v
that approach, th
with an intent to
it is not enough
influence some ar
an investigation in
grand jury's auth
deavor must have
effect" of interfer
tration of justice,
*Wood,* 6 F.3d 692.
knowledge that his
a pending procee
requisite intent
*United States.* 1
S.Ct. 542, 546–547
ernment did not
agents acted as a
that the grand ju

* The syllabus constit
the Court but has b
of Decisions for th

to First Amendment concerns. U.S.C.A. Const.Amend. 1.

*Syllabus*

Respondent Aguilar, a United States District Judge, was convicted of illegally disclosing a wiretap in violation of 18 U.S.C. § 2232(c), even though the authorization for the particular wiretap had expired before the disclosure was made. Because he lied to Federal Bureau of Investigation (FBI) agents during a grand jury investigation, he also was convicted of endeavoring to obstruct the due administration of justice under § 1503. The Court of Appeals reversed both convictions, reasoning that Aguilar's conduct in each instance was not covered by the statutory language.

*Held:*

1. Uttering false statements to an investigating agent who might or might not testify before a grand jury is not sufficient to make out a violation of § 1503's prohibition of "endeavor[ing] to influence, obstruct, or impede ... the due administration of justice." The "nexus" requirement developed in recent Courts of Appeals decisions—whereby the accused's act must have a relationship in time, causation, or logic with grand jury or judicial proceedings—is a correct construction of § 1503's very broad language. Under that approach, the accused must take action with an intent to influence such proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. Moreover, the endeavor must have the "natural and probable effect" of interfering with the due administration of justice, see, *e.g., United States v. Wood,* 6 F.3d 692, 695, and a person lacking knowledge that his actions are likely to affect a pending proceeding necessarily lacks the requisite intent to obstruct, *Pettibone v. United States,* 148 U.S. 197, 206–207, 13 S.Ct. 542, 546–547, 37 L.Ed. 419. The Government did not show here that the FBI agents acted as an arm of the grand jury, that the grand jury had subpoenaed their

testimony or otherwise directed them to appear, or that respondent knew that his false statements would be provided to the grand jury. Indeed, the evidence goes no further than showing that respondent testified falsely to an investigating agent. What use will be made of such testimony is so speculative that the testimony cannot be said to have the "natural and probable effect" of obstructing justice. Pp. 2361–2363.

|594|2. Disclosure of a wiretap after its authorization expires violates § 2232(c), which provides criminal penalties for anyone who, "[1] having knowledge that a Federal ... officer has been authorized or has applied for authorization ... to intercept a wire ... communication, [2] in order to obstruct, impede, or prevent such interception, [3] gives notice or attempts to give notice of the possible interception to any person." Contrary to the Court of Appeals' holding, the statutory language does not require that the wiretap application or authorization be pending or *in case at the time of the disclosure.* Such a narrow purpose is not evidenced by the term "such interception" in the statute's second clause, which merely establishes that the defendant must intend to obstruct the interception made pursuant to the application or authorization of which he has the knowledge required by the first clause. Similarly, the phrase "possible interception" in the third clause was not designed to limit the punishable offense to cases where the interception was factually "possible," but was intended to recognize the fact that at the time the prohibited notice was given it very likely could not be known whether or not there would be an interception. Moreover, without the word "possible," the statute would only prohibit giving notice of "the interception": It would not reach the giving of notice of an application which has not yet resulted in an authorization or an authorization which has not yet resulted in an interception. Finally, the statute need not be read to exclude disclosures of expired wiretaps because of concern that a broader construction would run counter to the First Amendment. The Gov-

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

ernment's interest in nondisclosure by offi-
cials in sensitive confidential positions is
quite sufficient to justify the construction of
the statute as written, without any artificial
narrowing because of First Amendment con-
cerns. Pp. 2363–2365.

21 F.3d 1475 (CA9 1994), affirmed in
part, reversed in part, and remanded.

REHNQUIST, C.J., delivered the
opinion of the Court, in which O'CONNOR,
SOUTER, GINSBURG, and BREYER, JJ.,
joined, in Part I of which STEVENS, J.,
joined, and in all but Part I and the last
paragraph of Part II of which SCALIA,
KENNEDY, and THOMAS, JJ., joined.
STEVENS, J., filed an opinion concurring in
part and dissenting in part, post, p. 2365.
SCALIA, J., filed an opinion concurring in
part and dissenting in part, in which
KENNEDY and THOMAS, JJ., joined, post,
p. 2367.

James Feldman, for petitioner.

Robert D. Luskin, for respondent.

For U.S. Supreme Court briefs, see:
1995 WL 15025 (Pet.Brief)
1995 WL 60727 (Resp.Brief)
1995 WL 108178 (Reply.Brief)

Chief Justice REHNQUIST delivered the
opinion of the Court.

A jury convicted United States District
Judge Robert Aguilar of one count of illegal-
ly disclosing a wiretap in violation of 18
U.S.C. § 2232(c), and of one count of endeav-
oring to obstruct the due administration of
justice in violation of § 1503. A panel of the
Court of Appeals for the Ninth Circuit af-
firmed the conviction under § 2232(c) but
reversed the conviction under § 1503. After
rehearing en banc, the Court of Appeals
reversed both convictions. We granted cer-
tiorari to resolve a conflict among the Feder-
al Circuits over whether § 1503 punishes
false statements made to potential grand
jury witnesses, and to answer the important
question whether disclosure of a wiretap af-
ter its authorization expires violates
§ 2232(c). 513 U.S. 1013, 115 S.Ct. 571, 130
L.Ed.2d 488 (1994).

Many facts remain disputed by the parties.
Both parties appear to agree, however, that a
motion for postconviction relief filed by one
Michael Rudy Tham represents the starting
point from which events bearing on this case
unfolded. Tham was an officer of the Inter-
national Brotherhood of Teamsters, and was
convicted of embezzling funds from the local
affiliate of that organization. In July 1987,
he filed a motion under 28 U.S.C. § 2255 to
have his conviction set aside. The motion
was assigned to Judge Stanley Weigel.
Tham, seeking to enhance the odds that his
petition would be granted, asked Edward
Solomon and Abraham Chalupowitz, a.k.a.
Abe Chapman, to assist him by capitalizing
on their respective acquaintances with anoth-
er judge in the Northern District of Califor-
nia, respondent Aguilar. Respondent knew
Chapman as a distant relation by marriage
and knew Solomon from law school. Solo-
mon and Chapman met with respondent to
discuss Tham's case, as a result of which
respondent spoke with Judge Weigel about
the matter.

Independent of the embezzlement convic-
tion, the Federal Bureau of Investigation
(FBI) identified Tham as a suspect in an
investigation of labor racketeering. On April
20, 1987, the FBI applied for authorization to
install a wiretap on Tham's business phones.
Chapman appeared on the application as a
potential interceptee. Chief District Judge
Robert Peckham authorized the wiretap.
The 30-day wiretap expired by law on May
20, 1987, 18 U.S.C. § 2518(5), but Chief
Judge Peckham maintained the secrecy of
the wiretap under § 2518(8)(d) after a show-
ing of good cause. During the course of the
racketeering investigation, the FBI learned
of the meetings between Chapman and re-
spondent. The FBI informed Chief Judge
Peckham, who, concerned with appearances
of impropriety, advised respondent in August
1987 that Chapman might be connected with
criminal elements because Chapman's name
had appeared on a wiretap authorization.

Five months after respondent learned that
Chapman had been named in a wiretap au-
thorization, he noticed a man observing his
home during a visit by Chapman. He alert-

ed his nephew to
message (with a
relay the inform
Chapman's phon
Respondent appa
both that Chapma
connection with
that the initial a
fect. Chief Judge
thorized another
effective from Oct
od in which respo
but there is no su
the latter had any
reauthorization.

At this point, re
the two separate
Two months after
nephew, a grand ju
alleged conspiracy
of Tham's habeas
questioned respon
view, respondent li
in the Tham case
wiretap. The gran
ment; a jury convi
of disclosing a wire
and one count of en
due administration
el of the Court o
Circuit affirmed th
reversed the § 150

On rehearing en
peals reversed both
son that the conduc
covered by the stat
1475 (1994). The
§ 2232(c) requires
ing wiretap applica
that had not expire
the statute was to
the "possible inter
of which the defend
at 1480. Finding
case impossible on
expired, it held res
not covered by the
statute. The Cour
that respondent ha
pending judicial pr
It first noted that
authorized or directi

ed his nephew to this fact and conveyed the message (with an intent that his nephew relay the information to Chapman) that Chapman's phone was being wiretapped. Respondent apparently believed, in error, both that Chapman's phones were tapped in connection with the initial application and that the initial authorization was still in effect. Chief Judge Peckham had in fact authorized another wiretap on Tham's phones effective from October 1987 through the period in which respondent made the disclosure, but there is no suggestion in the record that the latter had any specific knowledge of this reauthorization.

At this point, respondent's involvement in the two separate Tham matters converged. Two months after the disclosure[597] to his nephew, a grand jury began to investigate an alleged conspiracy to influence the outcome of Tham's habeas case. Two FBI agents questioned respondent. During the interview, respondent lied about his participation in the Tham case and his knowledge of the wiretap. The grand jury returned an indictment; a jury convicted Aguilar of one count of disclosing a wiretap, 18 U.S.C. § 2232(c), and one count of endeavoring to obstruct the due administration of justice, § 1503. A panel of the Court of Appeals for the Ninth Circuit affirmed the § 2232(c) conviction but reversed the § 1503 conviction.

On rehearing en banc, the Court of Appeals reversed both convictions for the reason that the conduct in each instance was not covered by the statutory language. 21 F.3d 1475 (1994). The court concluded that § 2232(c) requires the disclosure of a pending wiretap application or an authorization that had not expired because the purpose of the statute was to thwart interference with the "'possible interception'" of the wiretap of which the defendant had knowledge. *Id.,* at 1480. Finding the interception in this case impossible once the authorization had expired, it held respondent's disclosure was not covered by the plain language of the statute. The Court of Appeals also found that respondent had not interfered with a pending judicial proceeding under § 1503. It first noted that the grand jury had not authorized or directed the FBI investigation.

It then held that merely uttering false statements does not "'corruptly influence'" within the meaning of the statute. *Id.,* at 1485–1486. It drew this conclusion, in part, from 1988 amendments to § 1512, which added a prohibition on corrupt persuasion of witnesses. The court read the corrupt persuasion prohibited by § 1512 to require an active attempt to persuade a witness to tell a false story, and used the language in § 1512 as a guide to interpret the omnibus clause of § 1503 narrowly.

[598]I
Section 1503 provides:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice,* shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1503 (emphasis added).

The statute is structured as follows: first it proscribes persons from endeavoring to influence, intimidate, or impede grand or petit jurors or court officers in the discharge of their duties; it then prohibits injuring grand or petit jurors in their person or property because of any verdict or indictment rendered by them; it then prohibits injury of any court officer, commissioner, or similar officer on account of the performance of his official duties; finally, the "Omnibus Clause" serves as a catchall, prohibiting persons from

endeavoring to influence, obstruct, or impede the due administration of justice. The latter clause, it can be seen, is far more general in scope than the earlier clauses of the statute. Respondent [599]was charged with a violation of the Omnibus Clause, to wit: with "corruptly endeavor[ing] to influence, obstruct, and impede the ... grand jury investigation." App. 106.

The first case from this Court construing the predecessor statute to § 1503 was *Pettibone v. United States*, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893). There we held that "a person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had notice that justice was being administered in such court." *Id.*, at 206, 13 S.Ct., at 546. The Court reasoned that a person lacking knowledge of a pending proceeding necessarily lacked the evil intent to obstruct. *Id.*, at 207, 13 S.Ct., at 546–547. Recent decisions of Courts of Appeals have likewise tended to place metes and bounds on the very broad language of the catchall provision. The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. *United States v. Brown*, 688 F.2d 596, 598 (CA9 1982) (citing cases). Some courts have phrased this showing as a "nexus" requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings. *United States v. Wood*, 6 F.3d 692, 696 (CA10 1993); *United States v. Walasek*, 527 F.2d 676, 679, and n. 12 (CA3 1975). In other words, the endeavor must have the " 'natural and probable effect' " of interfering with the due administration of justice. *Wood, supra*, at 695; *United States v. Thomas*, 916 F.2d 647, 651 (CA11 1990); *Walasek, supra*, at 679. This is not to say that the defendant's actions need be successful; an "endeavor" suffices. *United States v. Russell*, 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921). But as in *Pettibone*, if the defendant lacks knowledge that his actions

are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.

[1] [600]Although respondent urges various broader grounds for affirmance,[1] we find it unnecessary to address them because we think the "nexus" requirement developed in the decisions of the Courts of Appeals is a correct construction of § 1503. We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, *Dowling v. United States*, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985), and out of concern that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed," *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). We do not believe that uttering false statements to an investigating agent—and that seems to be all that was proved here—who might or might not testify before a grand jury is sufficient to make out a violation of the catchall provision of § 1503.

[2] The Government did not show here that the agents acted as an arm of the grand jury, or indeed that the grand jury had even summoned the testimony of these particular agents. The Government argues that respondent "understood that his false statements would be provided to the grand jury" and that he made the statements with the intent to thwart the grand jury investigation and not just the FBI investigation. Brief for United States 18. The Government supports its argument with a citation to the transcript of the recorded conversation between Aguilar and the FBI agent at the point where Aguilar asks whether he is a target of a grand jury investigation. The agent responded to the question by stating:

"[T]here is a Grand Jury meeting. Convening I guess that's the correct word. Um some evidence will be heard I'm ⋯ I'm sure on this issue." App. 86.

[600]Because resp[...]
proceeding, the [...]
tends that Agu[...]
goes to those ma[...]
itself, in the for[...]
documents.[2]

We think th[...]
upon by the Gov[...]
rational trier of [...]
dent knew that [...]
provided to the [...]
evidence goes n[...]
respondent testi[...]
ing agent. Such [...]
the other side of [...]
of one who deliv[...]
mony to the gra[...]
the latter sort al[...]
jury will consider[...]
tions. But what [...]
testimony given [...]
who has not bee[...]
directed to appe[...]
far more speculat[...]
said to have the "[...]
of interfering wit[...]
justice.

[3] Justice S[...]
ment of the statu[...]
the word "endeav[...]
excludes defenda[...]
pose but use mea[...]
rally and improba[...]
2368. This criti[...]
reading of the st[...]
deavor" a useful f[...]
conduct punishabl[...]
with an intent to [...]
manner that is lik[...]
is foiled in some [...]
with the requisite [...]
naed witness who [...]
testify, or who tes[...]
the defendant's ve[...]
fendant has endea[...]
not actually obstr[...]

---

1. Respondent argues that the term "corruptly" is vague and overbroad as applied to the type of conduct at issue in this case and that Congress

narrowed the scope of the Omnibus Clause when it expressly punished his conduct in 18 U.S.C. § 1512.

2. See, *e.g., United[...]*
1365, 1367–1368 [...]
and instructed co-w[...]
to subpoena *duce[...]*
*Williams*, 874 F.2[...]
(uttered false testi[...]
*States v. McComb*,

[60]Because respondent knew of the pending proceeding, the Government therefore contends that Aguilar's statements are analogous to those made directly to the grand jury itself, in the form of false testimony or false documents.[2]

We think the transcript citation relied upon by the Government would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury, and that the evidence goes no further than showing that respondent testified falsely to an investigating agent. Such conduct, we believe, falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations. But what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative. We think it cannot be said to have the "natural and probable effect" of interfering with the due administration of justice.

[3]  Justice SCALIA criticizes our treatment of the statutory language for reading the word "endeavor" out of it, inasmuch as it excludes defendants who have an evil purpose but use means that would "only unnaturally and improbably be successful." *Post,* at 2368. This criticism is unwarranted. Our reading of the statute gives the term "endeavor" a useful function to fulfill: It makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some [60]way. Were a defendant with the requisite intent to lie to a subpoenaed witness who is ultimately not called to testify, or who testifies but does not transmit the defendant's version of the story, the defendant has endeavored to obstruct, but has not actually obstructed, justice. Under our

approach, a jury could find such defendant guilty.

Justice SCALIA also apparently believes that *any* act, done with the intent to "obstruct . . . the due administration of justice," is sufficient to impose criminal liability. Under the dissent's theory, a man could be found guilty under § 1503 if he knew of a pending investigation and lied to his wife about his whereabouts at the time of the crime, thinking that an FBI agent might decide to interview her and that she might in turn be influenced in her statement to the agent by her husband's false account of his whereabouts. The intent to obstruct justice is indeed present, but the man's culpability is a good deal less clear from the statute than we usually require in order to impose criminal liability.

II

Section 2232(c) prohibits the disclosure of information that a wiretap has been sought or authorized. The statute reads:

"Whoever, having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization under chapter 119 to intercept a wire, oral, or electronic communication, in order to obstruct, impede, or prevent such interception, gives notice or attempts to give notice of the possible interception to any person shall be fined under this title or imprisoned not more than five years, or both."  18 U.S.C. § 2232(c).

This section is much more precisely targeted than is the catchall provision of § 1503 discussed above. The first clause defines the element of knowledge required for the act to be criminal: knowledge that an officer has been authorized or [60]has sought authorization to intercept a communication. The second clause defines the required intent with which the act be done: "in order to obstruct, impede, or prevent such interception." The

2. See, *e.g., United States v. Mullins,* 22 F.3d 1365, 1367–1368 (CA6 1994) (altered records and instructed co-worker to alter records subject to subpoena *duces tecum*); *United States v. Williams,* 874 F.2d 968, 976–982 (CA5 1989) (uttered false testimony to grand jury); *United States v. McComb,* 744 F.2d 555, 559 (CA7 1984)

(created false meeting minutes and voluntarily delivered them to grand jury); *United States v. Faudman,* 640 F.2d 20, 23 (CA6 1981) (falsified records, some of which had been sought by subpoena *duces tecum* ); *United States v. Walasek,* 527 F.2d 676, 679–680 (CA3 1975) (falsified documents requested by subpoena *duces tecum* ).

third clause defines the punishable act: "gives notice or attempts to give notice of the possible interception." Respondent persuaded the Court of Appeals to hold that the wiretap application or authorization must be pending or *in esse* at the time of the disclosure, but we do not believe any such requirement is to be found in the statutory language.

Respondent here urges the reasoning accepted by the Court of Appeals. "[T]he purpose of the statute is to prevent interference with 'possible interception.'" 21 F.3d, at 1480. Once a wiretap has expired or been denied, the Ninth Circuit reasoned, there is no "'possible interception'" to disclose or attempt to disclose. *Ibid.* The narrow purpose of the statute is further evidenced by the statute's intent requirement, which limits punishable disclosures to those undertaken with the intent to interfere with "'such interception'" of which the defendant "has knowledge." *Ibid.* Under the circumstances, the disclosure of an expired wiretap not only fails to violate the terms of the statute, it fails to implicate any interest protected by § 2232(c). Brief for Respondent 38.

[4] But this argument, we think, fails in the face of the statutory language itself. The term "such interception" is part of the intent requirement in the second clause; the defendant must intend to obstruct the interception made pursuant to the application or authorization of which he has the knowledge required by the first clause. The phrase "possible interception" is found in the third clause, which describes the act which offends the statute. A defendant intending to disclose the existence of a pending application would ordinarily have no way of knowing whether the application or authorization had resulted in an interception, and that is doubtless why the third clause uses the term "pos-

---

3. Justice STEVENS also argues that our reading of the statute would achieve no temporal limitation on liability and could result in the "absurd" prosecution of a discloser 10 years after the wiretap expired. *Post*, at 2366. Although we reserve the question for a case that presents it, we note that the wiretapping scheme as a whole suggests that a plausible temporal limit on liability for disclosure would be the point at which the authorizing judge notifies the interceptee and

---

sible" interception. It was not intended to limit the offense to cases where the interception based upon the application or authorization was factually possible, but to recognize the fact that at the time the prohibited notice was given it very likely could not be known whether or not there would be an interception.

The Court of Appeals thought its result justified by its view that the aim of the statute was to prevent interference with "possible" interceptions, and that if an interception was not possible because the wiretap was no longer in place at the time of the disclosure, that interest was not threatened. But the statute is aimed at something more than the interference with interceptions; it is aimed at disclosure of wiretap orders or applications which may lead to interceptions. The offense is complete at the time the notice is given, when it often cannot be known whether any interception will take place.

Justice STEVENS argues that § 2232(c) criminalizes disclosures of pending applications without a need to rely on the word "'possible.'" *Post*, at 2366. That is not so. The reference to pending applications occurs only in the clause specifying the knowledge element. The *actus reus* element must be independently satisfied. Without the word "possible," the statute would only prohibit giving notice of "the interception": It would not reach the giving of notice of an application which has not yet resulted in an authorization or an authorization which has not yet resulted in an interception. That Congress could have accomplished the same result by phrasing the statute differently—for instance, by repeating "'such interception'" in the third clause, *Ibid.*—does not undercut the fact that the word "possible" is necessary in the statute *as written* to criminalize such behavior.[3]

---

related parties of the existence of an application or authorization pursuant to 18 U.S.C. § 2518(8)(d). Such notification must occur "within a reasonable time" after denial of the application or termination of a wiretap, and may be postponed only upon a showing of "good cause." § 2518(8)(d). The parties did not brief this issue, and we need not decide it on these facts because respondent disclosed his knowledge of the wiretap application before Chief

---

Acceptance would open the "impossibility" application or o time of the discl ical failure, or whose convers from the place authorized, are *Osborn v. Unite* 87 S.Ct. 429, 43 expressed reser validity [of] the with all its subtl attempt, and we than the statut believe that Cor onto the languag

[5–8] Finally read the statut expired wiretaps broader constru the First Amend for such a restric ute. It is true th generally restric information that hands in the abs the highest orde *Publishing Co.*, 2667, 2671, 61 L statute here in qu a restriction gen who disclose wire obstruct, impede tion. Nor was member of the p pened to lawfully mation about the District Court Ju dential wiretap a who had authoriz wished to preserv Government offic positions may ha closure. See Fec hibiting the disclo tion). Likewise, imposed in connc quired through ci

Judge Peckham n That notification i

[606]Acceptance of respondent's position would open the door to additional claims of "impossibility" other than the fact that the application or order was not pending at the time of the disclosure. Some sort of mechanical failure, or the departure of the person whose conversation was to be intercepted from the place at which the reception was authorized, are two which come to mind. In *Osborn v. United States,* 385 U.S. 323, 333, 87 S.Ct. 429, 435, 17 L.Ed.2d 394 (1966), we expressed reservations about the "continuing validity [of] the doctrine of 'impossibility,' with all its subtleties," in the law of criminal attempt, and we would require much more than the statutory language before us to believe that Congress intended to engraft it onto the language of § 2232(c).

[5–8] Finally, respondent urges us to read the statute to exclude disclosures of expired wiretaps because of concern that a broader construction would run counter to the First Amendment. We see no necessity for such a restrictive construction of the statute. It is true that the Government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a "state interest of the highest order." *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 103, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979). But the statute here in question does not impose such a restriction generally, but only upon those who disclose wiretap information "in order to obstruct, impede, or prevent" the interception. Nor was the respondent simply a member of the general [606]public who happened to lawfully acquire possession of information about the wiretap; he was a Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court. Government officials in sensitive confidential positions may have special duties of nondisclosure. See Fed.Rule Crim.Proc. 6(e) (prohibiting the disclosure of grand jury information). Likewise, protective orders may be imposed in connection with information acquired through civil discovery without violat-

Judge Peckham notified the parties in May 1989. That notification issued two years after the FBI

ing the First Amendment. *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 31, 104 S.Ct. 2199, 2206, 81 L.Ed.2d 17 (1984). As to one who voluntarily assumed a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public. See *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (*per curiam*). In this case, Chief Judge Peckham postponed the notification of parties named in the application in order to maintain the secrecy of the wiretap. See 18 U.S.C. § 2518(1)(d). We think the Government's interest is quite sufficient to justify the construction of the statute as written, without any artificial narrowing because of First Amendment concerns.

Respondent raised below a challenge to the jury instructions, but the Court of Appeals found it unnecessary to decide. We affirm the decision of the Court of Appeals with respect to respondent's conviction under § 1503 and reverse with respect to respondent's conviction under § 2232(c). We remand for proceedings consistent with this decision.

*So ordered.*

Justice STEVENS, concurring in part and dissenting in part.

Although I agree with the Court's disposition of the 18 U.S.C. § 1503 issue, and also with its rejection of the First [607]Amendment challenge to respondent's conviction for disclosing a wiretap application under § 2232(c), I believe the Court of Appeals correctly construed § 2232(c) to invalidate respondent's conviction under that statute.

When respondent was convicted of disclosing a 30-day wiretap authorization that had expired months before the disclosure, he was convicted of an attempt to do the impossible: interfere with a nonexistent wiretap. Traditionally, the law does not proscribe an attempt unless the defendant's intent is accompanied by "a dangerous probability that [the unlawful result] will happen." *Swift & Co. v.*

first applied for authorization and one year after the last authorized wiretap expired.

*United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905) (Holmes, J.). Whether such a dangerous probability exists, of course, depends ultimately on what result we interpret the statute as having declared unlawful. See 2 W. LaFave & A. Scott, Substantive Criminal Law § 6.3, pp. 44–45 (1986). In this case, there was no dangerous probability that respondent actually would reveal the existence of a wiretap or wiretap application because none existed to reveal. We should abjure a construction of a criminal statute that leads to criminalizing nothing more than an evil intent accompanied by a harmless act, particularly when, as here, the statutory language does not clearly extend liability so far. Cf. *Simpson v. United States,* 435 U.S. 6, 14–15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978).

Indeed, the text of § 2232(c) favors a reading that requires, as an essential element of the offense, the possibility of interference with an authorized interception. Both the second and third clauses of the statute support this straightforward interpretation. The second clause requires that the defendant intend to impede "such interception." That phrase refers to an interception that the defendant knows a federal officer "has been authorized or has applied for authorization" to make. After the authorization expires, no "such interception" can occur. Moreover, to infer that "such interception" includes any interception that might be made pursuant to any subsequent reauthorization severely undermines the ₍₆₀₎statute's knowledge requirement by making actual knowledge of an initial, limited authorization the linchpin of liability for disclosing later, entirely conjectural or nonexistent authorizations. That inference contradicts our usual practice of giving strict effect to scienter provisions. See, *e.g., United States v. X–Citement Video, Inc.,* 513 U.S. 64, 68–71, 115 S.Ct. 464, 467–469, 130 L.Ed.2d 372 (1994).

The third clause of § 2232(c) describes the notice that a defendant must attempt to give a third person in order to violate the statute as notice of "*the* possible interception." The definite article necessarily refers to an interception that is "authorized" (or for which federal officers have applied for authoriza-

tion) per the second clause, thereby imposing authorization as a requirement to satisfy the next word, "possible." I agree with the Court that interceptions prevented by mechanical failures or the departure of the suspect are "possible" within the meaning of the statute, see *ante,* at 2364, as long as those interceptions, however unlikely, are legally "authorized." The wholly theoretical interception that respondent was convicted of attempting to impede was not authorized, nor had federal officers even sought authorization for it; therefore, it was not "possible" within the meaning of the statute.

The Court's attempt to explain the word "possible" as an assurance that the statute will cover interceptions that may or may not result from a pending application, see *ante,* at 2364, is unpersuasive. Because the statute plainly criminalizes disclosures of pending applications, "possible" does not need to do the work the Court assigns it. The phrase "such interception," already used in the second clause, would do just as well. The function of "possible" must be to place some temporal limitation on potential liability under the statute. Under the Court's reasoning, respondent could be found guilty if he had disclosed a 10–year–old application or authorization. The word "possible," properly understood, would prevent such an absurd result by limiting liability to ₍₆₀₎interceptions that could actually be made pursuant to present or pending authorization.

As the Court notes in response to this opinion, *ibid.,* under its reading the third clause serves to define the *actus reus* element of the crime, just as Congress could have done by replacing the phrase "notice of the possible interception" with the unambiguous phrase "notice of such authorization or application." That unambiguous language, however, would not achieve the temporal limitation on liability that I believe Congress intended to achieve with the words "possible interception." The Court appears to acknowledge the need for such a limitation. See *ante,* at 2364–2365, n. 3. Rather than recognizing the limitation the statute contains, however, the Court hints that it might in some future case invent one. Limiting liability to the time before the authorizing

posing
isfy the
ith the
by me-
he sus-
g of the
s those
legally
l inter-
d of at-
ed, nor
thoriza-
ossible"

he word
statute
may not
ee *ante,*
he stat-
of pend-
need to
t. The
used in
as well.
to place
nability
rt's rea-
ilty if he
ation or
properly
absurd
ceptions
. to pres-

: to this
he third
*reus* ele-
ess could
notice of
nambigu-
zation or
anguage,
poral lim-
Congress
"possible
s to ac-
imitation.
her than
ute con-
. it might
Limiting
thorizing

judge announces the wiretap may well be "plausible." *ibid.,* but no plausible basis exists for finding that limitation in the words of the statute. A wiser course than judicial legislation, I submit, is simply to adopt a literal, reasonable construction of the text that Congress drafted.

I would affirm the decision of the Court of Appeals in its entirety.

Justice SCALIA, with whom Justice KENNEDY and Justice THOMAS join, concurring in part and dissenting in part.

I join all but Part I and the last paragraph of Part II of the Court's opinion. I would reverse the Court of Appeals, and would uphold respondent's conviction, on the count charging violation of 18 U.S.C. § 1503.

I

The "omnibus clause" of § 1503, under which respondent was charged, provides:

"Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

This makes criminal not just success in corruptly influencing the due administration of justice, but also the "endeavor" to do so. We have given this latter proscription, which respondent was specifically charged with violating, see App. 106–107, a generous reading: "The word of the section is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes *any effort or essay* to accomplish the evil purpose that the section was enacted to prevent." *United States v. Russell,* 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921) (emphasis added) (interpreting substantially identical predecessor statute). Under this reading of the

[1] This complete disavowal of the impossibility defense may be excessive. As *Pettibone v. United States,* 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893), acknowledged, an endeavor to obstruct proceedings that did not exist would not violate the statute. "[O]bstruction can only arise when

statute, it is even immaterial whether the endeavor to obstruct pending proceedings is possible of accomplishment. In *Osborn v. United States,* 385 U.S. 323, 333, 87 S.Ct. 429, 435, 17 L.Ed.2d 394 (1966), we dismissed out of hand the "impossibility" defense of a defendant who had sought to convey a bribe to a prospective juror through an intermediary who was secretly working for the Government. "Whatever continuing validity," we said, "the doctrine of 'impossibility' ... may continue to have in the law of criminal attempt, that body of law is inapplicable here." *Ibid.* (footnote omitted).[1]

Even read at its broadest, however, § 1503's prohibition of "endeavors" to impede justice is not without limits. To "endeavor" means to strive or work for a certain end. Webster's New International Dictionary 844 (2d ed. 1950); 1 New $_{1611}$Shorter Oxford English Dictionary 816 (1993). Thus, § 1503 reaches only *purposeful* efforts to obstruct the due administration of justice, *i.e.,* acts performed with that very object in mind. See, e.g., *United States v. Mullins,* 22 F.3d 1365, 1370 (CA6 1994); *United States v. Ryan,* 455 F.2d 728, 734 (CA9 1972). This limitation was clearly set forth in our first decision construing § 1503's predecessor statute, *Pettibone v. United States,* 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893), which held an indictment insufficient because it had failed to allege the intent to obstruct justice. That opinion rejected the Government's contention that the intent required to violate the statute could be found in "the intent to commit an unlawful act, in the doing of which justice was in fact obstructed"; to justify a conviction, it said, "the specific intent to violate the statute must exist." *Id.,* at 207, 13 S.Ct. at 547. *Pettibone* did acknowledge, however—and here is the point that is distorted to produce today's opinion—that the specific intent to obstruct justice could be found where the defendant intentionally committed a wrongful act that had obstruction of

justice is being administered." *Id.,* at 207, 13 S.Ct., at 546. See, e.g., *United States v. Williams,* 874 F.2d 968, 977 (CA5 1989) ("There are three core elements that the government must establish ...: (1) there must be a pending judicial proceeding").

justice as its "natural and probable consequence." *Ibid.*

Today's "nexus" requirement sounds like this, but is in reality quite different. Instead of reaffirming that "natural and probable consequence" is one way of establishing intent, it *substitutes* " ' "natural and probable effect" ' " *for* intent, requiring that factor even when intent to obstruct justice is otherwise clear. See *ante*, at 2362, quoting *United States v. Wood*, 6 F.3d 692, 695 (CA10 1993), which in turn quotes *United States v. Thomas*, 916 F.2d 647, 651 (CA11 1990).[2] But while it is quite proper to derive an *intent* requirement from § 1503's use of the word "endeavor," it is quite impossible to derive a *"natural and probable consequence"* requirement. One would be "endeavoring" to obstruct justice if he intentionally set out to do it by means that would only unnaturally and improbably be successful. As we said in *Russell*, "any effort or essay" corruptly to influence, obstruct, or impede the due administration of justice constitutes a forbidden endeavor, 255 U.S., at 143, 41 S.Ct., at 261, even as we held in *Osborn*, an effort that is *incapable* of having that effect, see 385 U.S., at 333, 87 S.Ct., at 435.

The Court does not indicate where its "nexus" requirement is to be found in the words of the statute. Instead, it justifies its holding with the assertion that "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given ... of what the law intends to do if a certain line is passed." *Ante*, at 2362 (citation and internal quotation marks omitted). But "exercising restraint in *assessing the reach* of a federal criminal statute" (which is what the rule of lenity requires, see *United States v. Bass*, 404 U.S. 336, 347–348, 92 S.Ct. 515, 522, 30 L.Ed.2d

488 (1971)) is quite different from importing extratextual requirements *in order to limit the reach* of a federal criminal statute, which is what the Court has done here. By limiting § 1503 to acts having the "natural and probable effect" of interfering with the due administration of justice, the Court effectively reads the word "endeavor," which we said in *Russell* embraced "any effort or essay" to obstruct justice, 255 U.S., at 143, 41 S.Ct., at 261, out of the omnibus clause, leaving a prohibition of only actual obstruction and competent attempts.

II

The Court apparently adds to its "natural and probable effect" requirement the requirement that the defendant *know* of that natural and probable effect. See *ante*, at 2362 ("[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct"). Separate proof of such knowledge is not, I think, required for the orthodox use of the "natural and probable effect" rule discussed in *Pettibone:* Where the defendant intentionally commits a wrongful act that *in fact* has the "natural and probable consequence" of obstructing justice, "the unintended wrong may derive its character from the wrong that was intended." 148 U.S., at 207, 13 S.Ct., at 547. Or, as we would put the point in modern times, the jury is entitled to presume that a person intends the natural and probable consequences of his acts.

While inquiry into the state of the defendant's knowledge seems quite superfluous to the Court's opinion (since the act performed did not have the requisite "natural and probable effect" anyway), it is necessary to my disposition of the case. As I have said, I think an act committed *with intent to ob-*

struct the due administration of justice]." *United States v. Silverman*, 745 F.2d 1386, 1393 (CA11 1984). See also *United States v. Fields*, 838 F.2d 1571, 1573 (CA11 1988). This does not impose a requirement of "natural and probable consequence," but approves a manner of proof of "intent." See, e.g., *United States v. Neiswender*, 590 F.2d 1269, 1273 (CA4), cert. denied, 441 U.S. 963, 99 S.Ct. 2410, 60 L.Ed.2d 1068 (1979).

515 U.S. 615

*struct* is all
fairly be thou
part upon wl
have known.
at issue, in n
dent knew th
*provided* to
(emphasis ad
posed by the
and-probable-
whether resp
erroneously
ment *might*
(which is all
port the concl
was to mislea
miliar standa
U.S. 307, 99
(1979), to the
rational juror
beyond a rea
had corruptly
administration
the FBI agent
grand jury in

Recorded c
respondent kn
vened, App. 47
a target of its
that he feared
his actions of l
*id.*, at 51. Re
at least at the
was his "impr
the FBI agen
grand jury. 9
evidence furth
made false st
that minimize
ters the grand
App. 73, 76, :
evidence in th
Government, I
that no rationa

3. Those clause

"Whoever cc
by any threate
deavors to infl
grand or petit j
of the United
serving at any
before any Uni
committing m:

*struct* is all that matters; and what one can fairly be thought to have intended depends in part upon what one can fairly be thought to have known. The critical point of knowledge at issue, in my view, is not whether "respondent knew that his false statement *would be provided* to the grand jury," *ante,* at 2363 (emphasis added) (a heightened burden imposed by the Court's knowledge-of-natural-and-probable-effect requirement), but rather whether respondent knew—or indeed, even erroneously *believed*—that his false statement *might* be provided to the grand jury (which is all the knowledge needed to support the conclusion that the purpose of his lie was to mislead the jury). Applying the familiar standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to the proper question, I find that a rational juror could readily₆₁₄have concluded beyond a reasonable doubt that respondent had corruptly endeavored to impede the due administration of justice, *i.e.,* that he lied to the FBI agents intending to interfere with a grand jury investigation into his misdeeds.

Recorded conversations established that respondent knew a grand jury had been convened, App. 47; that he had been told he was a target of its investigation, *id.,* at 68; and that he feared he would be unable to explain his actions if he were subpoenaed to testify, *id.,* at 51. Respondent himself testified that, at least at the conclusion of the interview, it was his "impression" that his statements to the FBI agents would be reported to the grand jury. 9 Tr. 1360 (Aug. 14, 1990). The evidence further established that respondent made false statements to the FBI agents that minimized his involvement in the matters the grand jury was investigating. See App. 73, 76, 81, 83–84, 86. Viewing this evidence in the light most favorable to the Government, I am simply unable to conclude that no rational trier of fact could have found

beyond a reasonable doubt that respondent lied specifically because he thought the agents *might* convey what he said to the grand jury—which suffices to constitute a corrupt endeavor to impede the due administration of justice. In fact, I think it would be hard for a juror to conclude otherwise.

### III

Since I find against respondent on the § 1503 count, I must consider several other grounds offered by respondent for affirming the Court of Appeals' setting aside of his conviction. First, invoking the interpretive canon of *ejusdem generis,* he argues that, since all the rest of § 1503 refers only to actions directed at jurors and court officers,[3] the omnibus clause cannot₆₁₅ apply to actions directed at witnesses. But the rule of *ejusdem generis,* which "limits general terms which follow specific ones to matters similar to those specified," *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936); accord, *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980), has no application here. Although something of a catchall, the omnibus clause is *not* a general or collective term following a list of specific items to which a particular statutory command is applicable (*e.g.,* "fishing rods, nets, hooks, bobbers, sinkers, and other equipment"). Rather, it is one of the several distinct and independent prohibitions contained in § 1503 that share only the word "Whoever," which begins the statute, and the penalty provision which ends it. Indeed, given the already broad terms of the other clauses in § 1503, to limit the omnibus clause in the manner respondent urges would render it superfluous. See *United*

---

3. Those clauses provide:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his

duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties ... shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1503.

*struct* is all that matters; and what one can fairly be thought to have intended depends in part upon what one can fairly be thought to have known. The critical point of knowledge at issue, in my view, is not whether "respondent knew that his false statement *would be provided* to the grand jury," *ante,* at 2363 (emphasis added) (a heightened burden imposed by the Court's knowledge-of-natural-and-probable-effect requirement), but rather whether respondent knew—or indeed, even erroneously *believed*—that his false statement *might* be provided to the grand jury (which is all the knowledge needed to support the conclusion that the purpose of his lie was to mislead the jury). Applying the familiar standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to the proper question, I find that a rational juror could readily [615]have concluded beyond a reasonable doubt that respondent had corruptly endeavored to impede the due administration of justice, *i.e.,* that he lied to the FBI agents intending to interfere with a grand jury investigation into his misdeeds.

Recorded conversations established that respondent knew a grand jury had been convened, App. 47; that he had been told he was a target of its investigation, *id.,* at 68; and that he feared he would be unable to explain his actions if he were subpoenaed to testify, *id.,* at 51. Respondent himself testified that, at least at the conclusion of the interview, it was his "impression" that his statements to the FBI agents would be reported to the grand jury. 9 Tr. 1360 (Aug. 14, 1990). The evidence further established that respondent made false statements to the FBI agents that minimized his involvement in the matters the grand jury was investigating. See App. 73, 76, 81, 83–84, 86. Viewing this evidence in the light most favorable to the Government, I am simply unable to conclude that no rational trier of fact could have found

beyond a reasonable doubt that respondent lied specifically because he thought the agents *might* convey what he said to the grand jury—which suffices to constitute a corrupt endeavor to impede the due administration of justice. In fact, I think it would be hard for a juror to conclude otherwise.

## III

Since I find against respondent on the § 1503 count, I must consider several other grounds offered by respondent for affirming the Court of Appeals' setting aside of his conviction. First, invoking the interpretive canon of *ejusdem generis,* he argues that, since all the rest of § 1503 refers only to actions directed at jurors and court officers,[3] the omnibus clause cannot[615] apply to actions directed at witnesses. But the rule of *ejusdem generis,* which "limits general terms which follow specific ones to matters similar to those specified," *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936); accord, *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980), has no application here. Although something of a catchall, the omnibus clause is *not* a general or collective term following a list of specific items to which a particular statutory command is applicable (*e.g.,* "fishing rods, nets, hooks, bobbers, sinkers, and other equipment"). Rather, it is one of the several distinct and independent prohibitions contained in § 1503 that share only the word "Whoever," which begins the statute, and the penalty provision which ends it. Indeed, given the already broad terms of the other clauses in § 1503, to limit the omnibus clause in the manner respondent urges would render it superfluous. See *United*

---

3. Those clauses provide:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his

duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties ... shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1503.

*States v. Howard,* 569 F.2d 1331, 1333 (CA5 1978).

Respondent next contends that because Congress in 1982 enacted a different statute, 18 U.S.C. § 1512, dealing with witness tampering, and simultaneously removed from § 1503 the provisions it had previously contained specifically addressing efforts to influence or injure witnesses, see Victim and Witness Protection Act of 1982, Pub.L. 97–291, 96 Stat. 1249–1250, 1253, his witness-related conduct is no longer punishable under the omnibus clause of § 1503. The 1982 amendment, however, did nothing to alter the omnibus clause, which by its terms encompasses corrupt "endeavors to influence, obstruct, or impede, the due administration of |₆₁₆|justice." The fact that there is now some overlap between § 1503 and § 1512 is no more intolerable than the fact that there is some overlap between the omnibus clause of § 1503 and the other provisions of § 1503 itself. It hardly leads to the conclusion that § 1503 was, to the extent of the overlap, silently repealed. It is not unusual for a particular act to violate more than one criminal statute, see, e.g., *Cavieres v. United States,* 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911), and in such situations the Government may proceed under any statute that applies, see, e.g., *United States v. Batchelder,* 442 U.S. 114, 123–124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979); *United States v. Beacon Brass Co.,* 344 U.S. 43, 45–46, 73 S.Ct. 77, 78–79, 97 L.Ed. 61 (1952). It is, moreover, "a cardinal principle of statutory construction that repeals by implication are not favored." *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976); see also *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936).

Finally, respondent posits that the phrase "'corruptly ... endeavors to influence, obstruct, or impede' may be unconstitutionally vague," in that it fails to provide sufficient notice that lying to potential grand jury witnesses in an effort to thwart a grand jury investigation is proscribed. Brief for Respondent 22, n. 13. Statutory language need not be colloquial, however, and the term "corruptly" in criminal laws has a longstanding and well-accepted meaning. It denotes "[a]n act done with an intent to give some advan-

tage inconsistent with official duty and the rights of others.... It includes bribery but is more comprehensive; because an act may be corruptly done though the advantage to be derived from it be not offered by another." *United States v. Ogle,* 613 F.2d 233, 238 (CA10) (internal quotation marks omitted), cert. denied, 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980). See also Ballentine's Law Dictionary 276 (3d ed. 1969); Black's Law Dictionary 345 (6th ed. 1990). As the District Court here instructed the jury:

"An act is done corruptly if it's done voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method, with a hope or |₆₁₇|expectation of either financial gain or other benefit to oneself or a benefit of another person." App. 117.

Moreover, in the context of obstructing jury proceedings, any claim of ignorance of wrongdoing is incredible. Acts specifically intended to "influence, obstruct, or impede, the due administration of justice" are obviously wrongful, just as they are necessarily "corrupt." See *Ogle, supra,* at 239; *United States v. North,* 910 F.2d 843, 941 (CADC) (Silberman, J., concurring in part and dissenting in part), modified, 920 F.2d 940 (1990); *United States v. Reeves,* 752 F.2d 995, 999 (CA5), cert. denied, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985).

\* \* \*

The "nexus" requirement that the Court today engrafts into § 1503 has no basis in the words Congress enacted. I would reverse that part of the Court of Appeals' judgment which set aside respondent's conviction under that statute.



---

**WE**

A
D

Lawyer
brought acti
lidity of Flo
lawyers fron
sonal injury
30 days of a
trict Court f
Elizabeth A
1543, held th
ing violated
appealed.
Appeals, Bl.
affirmed. 1
tiorari, 115
O'Connor.
First Amen
*Central Hu*
mercial spec

Revers

Justice
in which Ju
Justice Gin

**1. Constitu**
Lawye
speech, and
First Am
Const.Ame

**2. Constit**
First
lawyer adv
not absolu

**3. Constit**
Comm
sure of p
subordinat
ment value
lation tha

the policy in question, fails to notify the GPSC that such certification has been canceled prior to the loss, and the motor carrier subsequently purchases a second policy also in effect at the time of the loss, does Georgia law permit extension of the GPSC continuous coverage provision to provide "stacking" of the two policies with respect to the motoring public?

[1] The Supreme Court of Georgia has answered the first question as follows:

> Based on the purpose of the motor carrier act and PSC regulations, we conclude that the continuous coverage provision applies to motor vehicle collisions that occur outside the state of Georgia. The state motor carrier acts were enacted to protect members of the general public against injuries caused by the negligence of a Georgia motor carrier. The statutes do not preclude the application of state law to motor carriers with a Georgia certificate of public convenience and necessity for injuries they cause outside Georgia. The policy in this case covered accidents that occurred throughout the United States during the policy period. Given the purpose of the motor carrier laws and the nature of interstate travel, we conclude that the continuous coverage provision applies to both Georgia and out-of-state residents who are injured in other states by Georgia motor carriers.

*DeHart v. Liberty Mut. Ins. Co.,* 270 Ga. 381, 509 S.E.2d 913 (1998) (footnote omitted).

[2] The Supreme Court of Georgia has answered the second certified question as follows:

> In this case, Liberty Mutual filed a form certifying that it provided liability insurance for Senn Trucking effective May 27, 1986.[1] That certificate of insurance stated that it could not be cancelled without giving thirty days notice of cancellation in writing to the commission. Although Liberty Mutual cancelled the policy, it did not file written notice of the cancellation with the commission. Because the policy continued until the PSC received proper writ-

ten notice of cancellation and Liberty Mutual did not file a Form K cancelling the policy with the commission before Adam DeHart was injured on May 28, 1988, we conclude that Liberty Mutual is liable to the DeHarts based on the continuous coverage provision of the Georgia PSC regulations.

*Id.* at 918.

Based on the Supreme Court of Georgia's opinion in this case, we conclude that the district court properly granted the DeHart's motion for summary judgment and entered final judgment in their favor. Accordingly, we AFFIRM.



UNITED STATES of America,
**Plaintiff–Appellee,**

v.

**Kishor VAGHELA, Defendant–Appellant.**

No. 97-3472.

United States Court of Appeals,
Eleventh Circuit.

March 12, 1999.

Defendant was convicted in the United States District Court for the Middle District of Florida, No. 97-68-CR-T-17C, H. Dale Cook, J., of conspiracy to defraud the United States and to obstruct justice and of soliciting and receiving illegal kickbacks for Medicare referrals. Defendant appealed. The Court of Appeals, Barkett, Circuit Judge, held that: (1) evidence that defendant agreed to participate in drawing up and asserting veracity of bogus contract in attempt to conceal evidence of illegal kickbacks was not sufficient to support conviction for conspiracy

---

1. The opinion actually states that the policy became effective in 1996. In light of the undisputed time frame during which the events relevant

to this action occurred, however, we assume that the Georgia Supreme Court intended to reflect that the policy became effective in 1986.

to obstruct justice, and (2) amount of loss, for purposes of restitution, was amount defendant received in kickbacks, not amount paid by Department of Health and Human Services (DHHS) for services rendered.

Affirmed in part, reversed in part, vacated in part, and remanded.

**1. Conspiracy ⬅23.1**

Elements of the offense of conspiracy are: (1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means.

**2. Conspiracy ⬅23.1**

Parties cannot be found guilty of conspiring to commit an act that is not itself against the law.

**3. Conspiracy ⬅34**

To prove a conspiracy to violate omnibus clause of obstruction of justice statute, the government must show that the actions the defendant agreed to take would themselves violate the statute, that is, would have the natural and probable effect of interfering with the due administration of justice in a way that is more than merely speculative. 18 U.S.C.A. § 1503.

**4. Conspiracy ⬅34**

Requirement for conviction of conspiracy to obstruct justice that the actions which the defendants conspired to take have the natural and probable effect of interfering with the due administration of justice does not encompass every agreement to deceive regarding the commission of a crime, but also is not so narrow as to preclude a conspiracy to obstruct specific future judicial proceedings, for example, an agreement to bribe members of a grand jury should one be struck in the future. 18 U.S.C.A. § 1503.

**5. Conspiracy ⬅34**

To sustain a conviction for conspiracy to obstruct justice, the government need not always show that a judicial proceeding existed at the time the defendants formed the conspiracy, but must demonstrate that the actions the conspirators agreed to take were directly intended to prevent or otherwise ob-

struct the processes of a specific judicial proceeding in a way that is more than merely speculative; mere fact that judicial proceedings are pending when the conspiracy to take actions alleged to obstruct justice was formed will not always be sufficient to prove the conspiracy itself. 18 U.S.C.A. § 1503.

**6. Conspiracy ⬅17(13)**

Evidence that defendant agreed to participate in drawing up of bogus contract in attempt to conceal evidence of illegal kickbacks on Medicare referrals, before any grand jury proceeding existed, and that he later agreed to lie to federal agents about veracity of contract, was not sufficient to support conviction for conspiracy to obstruct justice. 18 U.S.C.A. § 1503.

**7. Criminal Law ⬅1158(1)**

District court's factual findings as to the amount of restitution are reviewed for clear error.

**8. Criminal Law ⬅1208.4(2)**

Restitution awarded the victim of a crime pursuant to the Victim and Witness Protection Act may not exceed the loss suffered by the victim for those crimes specifically charged. 18 U.S.C.A. §§ 3663, 3664.

**9. Criminal Law ⬅1208.4(2)**

Government has the burden of proving by a preponderance of the evidence the amount of the loss for purposes of restitution award pursuant to the Victim and Witness Protection Act. 18 U.S.C.A. §§ 3663, 3664.

**10. Criminal Law ⬅1208.4(2)**

Amount of loss suffered by Department of Health and Human Services (DHHS) as result of illegal kickbacks from Medicare referrals to laboratory, for purposes of restitution under Victim and Witness Protection Act, was equivalent to amount defendant received in kickbacks, rather than amount paid by DHHS to laboratory for services rendered, absent any evidence that laboratory did not perform services ordered by doctors or that any of tests ordered by doctors and paid for by DHHS were anything other than medically necessary. 18 U.S.C.A. §§ 3663, 3664.

Louis
Showers
pellant.

Charle
ra Phipp
Plaintiff-

Appea
Court f

Before
Judges,

BARK

Kishoi
for cons
and to o
tion for
Medicar
guments
insufficie
for cons
the distr
tution ov
United S
man Ser
referred
amount
kickback
tainted
the pros
ject the
commen
first an
therefor
for cons
his conv
the orde
$50,420.(
court fo
this opin

I. Ba

Kishoi
the Fam
cal prac
Larry L
of 1993,
Extendi

* Honora
cuit Ju
nation.

r-06334-WDF    Document 53    Entered on FLSD Docket 02/28/2001    Pa

judicial
merely
proceed-
y to take
ice was
to prove
§ 1503.

d to par-
ontract in
egal kick-
afore any
d that he
nts about
ifficient to
o obstruct

s as to the
d for clear

ctim of a
od Witness
ne loss suf-
nes specifi-
3663, 3664.

of proving
vidence the
f restitution
ond Witness
3663, 3664.

Department
(DHHS) as
Medicare re-
es of restitu-
s Protection
lefendant re-
amount paid
services ren-
it laboratory
d by doctors
doctors and
ng other than
C.A. §§ 3663,

Louis Kwall, Elizabeth M. Amir, Kwall &
Showers, Clearwater, FL, for Defendant-Ap-
pellant.

Charles Wilson, Susan Humes Raab, Tam-
ra Phipps, Asst. U.S. Attys., Tampa, FL, for
Plaintiff-Appellee.

Appeal from the United States District
Court for the Middle District of Florida.

Before DUBINA and BARKETT, Circuit
Judges, and JONES *, Senior Circuit Judge.

BARKETT, Circuit Judge:

Kishor Vaghela appeals from his conviction
for soliciting and receiving kickbacks for
Medicare referrals. Vaghela raises three ar-
guments in this appeal: (1) that there was
insufficient evidence to support his conviction
for conspiracy to obstruct justice; (2) that
the district court erred in assessing the resti-
tution owed at the total amount for which the
United States Department of Health and Hu-
man Services ("DHHS") was billed for work
referred by Vaghela, rather than at the
amount Vaghela actually received in illegal
kickbacks; and (3) that his convictions were
tainted by improper remarks made during
the prosecution's closing argument. We re-
ject the final of these arguments without
comment, see 11th Cir. R. 36-1, but find the
first and second to be meritorious. We
therefore REVERSE Vaghela's conviction
for conspiracy to obstruct justice, AFFIRM
his conviction on all other counts, VACATE
the order for restitution in the amount of
$50,420.02, and REMAND to the district
court for further proceedings consistent with
this opinion.

### I. Background

Kishor Vaghela was the office manager for
the Family Medical Center ("FMC"), a medi-
cal practice owned and operated by Drs.
Larry Levine and Gary Levine. In August
of 1993, Raghu Desai, president and owner of
Extendicare Clinical Laboratory ("Extendi-

care"), contacted Vaghela. Desai had heard
that FMC was in the market for a lab to
handle its labwork, and was hoping to secure
this business for Extendicare. Vaghela told
Desai that he would refer $8000 to $10,000 in
business each month to Extendicare in ex-
change for personal monthly payments to
Vaghela of $2000 to $2500. Desai accepted
this offer. Between August 1993 and August
1994, Vaghela referred the labwork of 452
Medicare patients to Extendicare. In ex-
change for these referrals, Extendicare paid
Vaghela personally a total of $23,400 in kick-
backs. The labwork performed by Extendi-
care was ultimately paid for by DHHS in the
total amount of $50,420.02.

In August 1994, Desai told Vaghela that
Extendicare's payments to Vaghela were be-
ing investigated, and that they needed to
draft a contract that would legitimize them.
The pair then drafted and signed a contract,
backdated to August 1993, stating that all of
Extendicare's payments to Vaghela had been
made in exchange for Vaghela's "consulting
services."

Some time later,[1] Desai was interviewed
by federal agents. Subsequently, in Decem-
ber 1995, Desai called Vaghela to discuss
strategy. Vaghela told him to "stick with the
contract." On January 31, 1996, a federal
grand jury subpoenaed records from Desai.
Desai produced the back-dated contract and
copies of the checks he had given Vaghela.
Before producing the checks, Desai altered
them, adding a memo showing that they were
paid in exchange for "consulting work." De-
sai also produced 1099 forms stating that
Desai had employed Vaghela as a consultant
in 1993 and 1994.

During the investigation, the FBI ar-
ranged for Drs. Levine and Levine to engage
Vaghela in conversation about the referral
payments made to Vaghela by Extendicare.
This conversation was recorded by the FBI.
During this conversation, the physicians dis-
cussed Vaghela's apparent failure to share
with them the money he received from Ex-
tendicare, commented on how the payments

---

* Honorable Nathaniel R. Jones, Senior U.S. Cir-
cuit Judge for the Sixth Circuit, sitting by desig-
nation.

1. The record does not provide a specific date for
this interview.

were likely to appear to Medicare, and referred to the money received by Vaghela from Extendicare as "rent." Vaghela made no response to these allegations.

Vaghela was indicted by a grand jury in February 1997, and was tried in July of that year. During closing arguments, the prosecutor drew the jury's attention to Vaghela's non-responsiveness when confronted on tape by his employers, and suggested that the jury could draw conclusions regarding Vaghela's guilt from his silence during that conversation.

The jury found Vaghela guilty on all counts, including one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, thirteen counts of soliciting and receiving kickbacks in violation of 18 U.S.C. § 1320a–7b(b)(1)(A), and one count of conspiracy to obstruct justice in violation of 18 U.S.C. § 371. The district court sentenced him to twenty-one months of imprisonment and three years of supervised release on each count, with the sentences to run concurrently. The district court also ordered Vaghela to pay restitution to Medicare in the amount of $50,420.02. Vaghela now appeals.

## II.   Discussion

### 1.   The Conspiracy to Obstruct Justice

In this appeal, Vaghela argues that there was insufficient evidence to convict him of conspiracy to obstruct justice. Specifically, Vaghela argues that because there was no judicial proceeding ongoing at the time of the acts supporting the conspiracy charge, the government failed to prove its case on this count. See United States v. Cihak, 137 F.3d 252, 263 (5th Cir.1998) (holding that in order for the government to prove conspiracy to obstruct justice, "there must have existed a pending judicial proceeding at the time that defendants acted"). In response, the government maintains that it is enough for the government "to prove that the conspirators undertook to obstruct the due administration of justice in a federal proceeding that they anticipated would commence in the future."

2. This statute has since been amended. The above-quoted language is now contained in 18

United States v. Messerlian, 832 F.2d 778, 794 (3d Cir.1987). The government argues that because the defendants were being investigated, it was foreseeable that a federal proceeding would commence in the future and that the course of action agreed to by Vaghela and Desai would obstruct it.

[1, 2] The elements of the offense of conspiracy are "(1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." United States v. Toler, 144 F.3d 1423, 1426 (11th Cir.1998); see also 2 WAYNE R. LA FAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 6.4, at 60 (1986). To be guilty of conspiracy, in other words, parties must have agreed to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law. To prove conspiracy to obstruct justice, the government must therefore show that the defendant, in concert with one or more others, agreed to commit acts that would violate 18 U.S.C. § 1503, the felon obstruction of justice statute.

There is no question that Vaghela and Desai made an agreement. The question we must resolve is whether the acts they agreed to commit would violate § 1503. For if they would not, Vaghela could not be found guilty of conspiracy to obstruct justice, for the simple reason that such a finding would find him guilty of conspiring to commit acts that are not themselves illegal. Accordingly, we turn to the question of whether Vaghela's act would be violative of § 1503, the substantive offense Vaghela was accused of conspiring to commit.

At the time of the events leading to Vaghela's arrest and conviction, § 1503 provided in relevant part that

> Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.[2]

U.S.C. § 1503(a) (1998).

18 U.S.C. § 1503 (cited in *United States v. Aguilar*, 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995)). This provision of § 1503 is known as the "Omnibus Clause," and "serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). Not surprisingly, the broad language of § 1503's Omnibus Clause generated disagreement among the circuits as to the sorts of actions that would trigger this provision and ground a conviction for the substantive offense of obstruction of justice.[3]

In *Aguilar*, the Supreme Court resolved this disagreement. Citing with approval the effort of courts of appeals "to place metes and bounds on the very broad language of the catchall provision," the Court read into § 1503's Omnibus Clause what it termed a "'nexus' requirement—that the act must have a relationship in time, causation, and logic with the judicial proceedings." *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357 (citing *United States v. Wood*, 6 F.3d 692, 696 (10th Cir.1993); *United States v. Walasek*, 527 F.2d 676, 679 & n. 12 (3d Cir.1975); *see also* id. at 600, 115 S.Ct. 2357 ("[W]e think the 'nexus' requirement developed in the decisions of the Courts of Appeals is a correct construction of § 1503."). Specifically, drawing on its holding in *Pettibone v. United States*, 148 U.S. 197, 206, 13 S.Ct. 542, 37 L.Ed. 419 (1893), that "a person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had notice

that justice was being administered in such court," the Court found that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct [justice under § 1503]." *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357.

In *Aguilar*, a United States District Judge was charged and convicted of one count of § 1503 for lying to FBI agents who were investigating an alleged conspiracy to influence the outcome of a habeas case pending in the district where he served. The Supreme Court, however, found there to be insufficient evidence to support a conviction under § 1503. *See Aguilar*, 515 U.S. at 606, 115 S.Ct. 2357. Although a grand jury had already begun investigation into the conspiracy, the Court found the evidence offered by the government to be insufficient to support a conclusion "that [Aguilar] knew that his false statement would be provided to the grand jury." *Id.* at 601, 115 S.Ct. 2357. Instead, the Court found the evidence to "go[ ] no further than showing that [Aguilar] testified falsely to an investigating agent," and that "[s]uch conduct ... falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself." *Id.* The difference between these cases, according to the Court, lies in the fact that in the latter case, it is "all but assure[d] that the grand jury will consider the material in its deliberations," while the "use [that] will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury

3. Our own circuit took a broad view of § 1503's Omnibus Clause, requiring simply that the government establish "that the defendant should have reasonably foreseen that the natural and probable consequence of the success of his scheme would [obstruct the due administration of justice]." *United States v. Silverman*, 745 F.2d 1386, 1393 (11th Cir.1984). The Fifth Circuit adopted a far narrower interpretation, holding that to prove a violation of this clause, the government must establish three core elements: "(1) there must be a pending judicial proceeding; (2) the defendant must have knowledge or notice of the pending proceeding; and (3) the defendant must have acted corruptly with the specific intent to obstruct or impede the proceeding in its due administration of justice." *United States v. Williams*, 874 F.2d 968, 977 (5th Cir.1989).

Other circuits, including the Third and the Tenth, took a position falling somewhere between our own and that of the Fifth Circuit. *See United States v. Walasek*, 527 F.2d 676, 679 n. 12 (3d Cir.1975) (finding in § 1503's Omnibus Clause the need to "assess the extent of the relationship, whether in time, causation or logic, between the acts complained of and the progress of some 'administration of justice'"); *United States v. Wood*, 6 F.3d 692, 696 (10th Cir.1993) ("[P]articular acts, 'although arguably interfering with some aspect of the administration of justice, may be beyond the scope of § 1503 because the nexus to the progress of a judicial proceeding is too attenuated and the statutory construction therefore too strained'") (quoting *Walasek*, 527 F.2d at 679).

*is far more speculative." Id.* (emphasis added). As a consequence, the Court concluded that Aguilar's act of lying to the investigating agents "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice," and thus could not ground a conviction for the substantive offense of obstruction of justice. *Id.* For precisely this reason, if this very same act of giving false testimony to FBI agents had formed the basis of an agreement between Aguilar and another, Aguilar could not have been found guilty of conspiracy to obstruct justice because the act he would have conspired to commit would not have been itself illegal.

[3, 4] To prove a conspiracy to violate § 1503, the government must therefore show that *the actions the defendant agreed to take* would themselves violate § 1503, that is, would have " 'the natural and probable effect' of interfering with the due administration of justice" in a way that is more than merely "speculative." *Id.* As in *Aguilar,* this standard cannot encompass every agreement to deceive regarding the commission of a crime. Otherwise, every criminal who conspired at any time and in any way to conceal evidence of his or her crime would be susceptible to charges of conspiracy to obstruct justice, a result that would take us far beyond the federal interest in "preserving the integrity of a judicial proceeding" that we have elsewhere found to animate § 1503. *United States v. Veal,* 153 F.3d 1233, 1250 (11th Cir.1998) ("In *Aguilar,* the Court sought to place the phrase 'due administration of justice' in the context of a legitimate federal interest that was consistent with the amorphous language used by Congress. The Court determined that the phrase 'due administration of justice' connotes the federal government's interest in preserving the integrity of a judicial proceeding.").

At the same time, the requirement that the actions defendants conspired to take have "the natural and probable effect of interfer-

ing with the due administration of justice" is not so narrow as to preclude a conspiracy to obstruct specific future judicial proceedings, for example, an agreement to bribe members of a grand jury should one be struck in the future. *See United States v. Perlstein,* 126 F.2d 789, 794 (3d Cir.1942). This was the thrust of the Third Circuit's decision in *United States v. Messerlian,* 832 F.2d 778 (3d Cir.1987). In that case, the court upheld the conviction for conspiracy to obstruct justice of several state troopers who took steps to prevent a future federal grand jury investigation into a trooper's fatal assault of an arrestee who was in custody following his arrest for drunk driving.[4] *Id.* at 784. The Third Circuit held that the defendants were properly convicted of conspiracy to obstruct justice because "the federal proceeding need not be pending at the time the conspiracy is formed" and that the government merely had to prove that "the conspirators undertook to obstruct the due administration of justice in a federal proceeding that they anticipated would commence in the future." *Id.* at 794. Because the direct object of the actions agreed to by the conspirators in *Messerlian* was to prevent or otherwise obstruct the commencement of a grand jury investigation into the circumstances surrounding the arrestee's death, we agree with the Third Circuit that sufficient evidence existed to convict the *Messerlian* defendants of conspiracy to obstruct justice. Accordingly, we disagree with the Fifth Circuit position to the extent that it holds that a conviction for conspiracy to obstruct justice will *always* require a pending judicial proceeding to be in existence at the time the defendants formed the conspiracy. *See Cihak,* 137 F.3d at 263.

[5] Thus, in order to sustain a conviction for conspiracy to obstruct justice under 18 U.S.C. § 371 and 18 U.S.C. § 1503, the government need not always show that a judicial proceeding existed at the time the defendants formed the conspiracy, but must demonstrate that the actions the conspirators

4. These steps included "agree[ing] not to report the fact that [state trooper] Messerlian had assaulted [the arrestee], ... fail[ing] to provide routine information to the hospital concerning the circumstances of [the arrestee's] death, ... knowingly omitt[ing] accounts of the alleged as-

sault from statements prepared during interviews with [several witnesses], ... fabricat[ing] a story [regarding how the arrestee came to be injured, and] ... ma[king] false declarations before the grand jury." *Messerlian,* 832 F.2d at 784 (internal quotation marks omitted).

agreed to
prevent or
of a specific
is more t
*Aguilar,* 51
formulating
of the em
Court in *A*
ment—that
in time, ca
proceedings
S.Ct. 2357.
the adminis
include pe
though we
*Aguilar,* th
ings are pe
actions al
formed will
the conspir
S.Ct. 2357.

[6] Tur
clear to us
falls short
conviction
Vaghela pa
bogus cont
Desai to "s
time Vagh
tract, ther
Although t
gation—the
discernable
brief nor
ments, the
had reason
nor that th
way to fo
trying to c

In a b
criminal ac
every effc
However,
and literal
criminal of
*See Aguila*
("The acti
with an in
jury proce
be an inte
ceeding, si

5. This ca:

agreed to take were directly intended to prevent or otherwise obstruct the processes of a specific judicial proceeding in a way that is more than merely "speculative." *See Aguilar*, 515 U.S. at 601, 115 S.Ct. 2357. In formulating this standard, we remain mindful of the emphasis placed by the Supreme Court in *Aguilar* on the "'nexus' requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings." *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357. Processes integrally related to the administration of justice would of course include pending judicial proceedings, although we note that, as was the case in *Aguilar*, the mere fact that judicial proceedings are pending when the conspiracy to take actions alleged to obstruct justice was formed will not always be sufficient to prove the conspiracy itself. *See id.* at 601, 115 S.Ct. 2357.

[6] Turning to the facts at hand, it is clear to us that the government's evidence falls short of what is required to ground a conviction for conspiracy to obstruct justice. Vaghela participated in the drawing up of a bogus contract, and over a year later, urged Desai to "stick with th[at] contract." At the time Vaghela and Desai drew up the contract, there was no grand jury proceeding. Although there had been some FBI investigation—the exact parameters of which were discernable neither from the government's brief nor from the record—into the payments, there is no indication that the pair had reason to anticipate further proceedings, nor that they viewed their own actions as a way to forestall them. They were simply trying to conceal the evidence of their crime.[5]

In a broad and colloquial sense, every criminal act is an obstruction of justice, as is every effort to conceal that criminal act. However, as we noted earlier, such a broad and literal reading of the definition of this criminal offense is inconsistent with *Aguilar*. *See Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357 ("The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent

of the court's or grand jury's authority."). While Vaghela's efforts to camouflage his own criminal conduct are far from praiseworthy, it would be stretching the language of § 1503 well beyond its intended purpose of "preserving the integrity of a judicial proceeding," *United States v. Veal*, 153 F.3d 1233, 1250 (11th Cir.1998), to allow the act of hiding incriminating evidence to serve as the basis for a conspiracy to obstruct justice.

As we saw, in *Aguilar*, the defendant also sought to hide his own wrongdoing by lying to federal agents. *See Aguilar*, 515 U.S. at 596–97, 115 S.Ct. 2357. Yet, notwithstanding that a grand jury had already begun its investigations into that case, the Supreme Court found that the connection between Aguilar's false testimony at the time it was given and its effect on the judicial proceedings in question was too speculative to support the conclusion that it would have "the 'natural and probable effect' of interfering with the due administration of justice," *id.* at 601, 115 S.Ct. 2357. Thus, if Aguilar had agreed with another to do exactly the same thing he was convicted of doing in *Aguilar*, he could not have been found guilty of conspiracy to obstruct justice because, as we have seen, his conviction was reversed and therefore the act he would have conspired to commit would not under *Aguilar* be itself illegal.

This is precisely the case we have here. Vaghela and Desai certainly agreed to stick with a contract they knew to be false. But if drawing up and asserting the veracity of a false document would not itself ground a substantive charge of obstruction of justice— and it is clear that it would not do so under *Aguilar*, which requires that "the act must have a relationship in time, causation, or logic with the judicial proceedings," *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357—their agreement to do so cannot ground a conspiracy charge based on that same offense. And because the government is therefore unable to show that the pair agreed to commit one or more acts in violation of § 1503, Vaghela's conviction for conspiracy to obstruct justice must be reversed.

---

5. This case is thus very different from *Messerlian*     *See* discussion. *supra.*

### 2. *The Restitution Issue*

[7] Vaghela also argues that the district court erred in calculating the amount of restitution at $50,420.02, the amount for which DHHS was billed under Medicare for work referred to Extendicare by Vaghela, rather than at $23,400, the amount Vaghela received in illegal kickbacks in exchange for the referrals.[6] We agree.

[8, 9] It is well settled that restitution awarded the victim of a crime pursuant to the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3663, 3664 (1996),[7] may not exceed the loss suffered by the victim for those crimes specifically charged. *See United States v. Stone,* 948 F.2d 700, 704 (11th Cir.1991); *United States v. Cobbs,* 967 F.2d 1555, 1559 (11th Cir.1992). Moreover, the government has the burden of proving by a preponderance of the evidence the amount of the loss. *See United States v. Hairston,* 888 F.2d 1349, 1354 (11th Cir.1989).

[10] The district court set the restitution at the full amount that DHHS paid Extendicare for the labwork referred by Vaghela— $50,420.02. Yet the government does not suggest that Extendicare did not perform the services ordered by FMC. Thus, unless we are to believe that DHHS received no value at all for Extendicare's work, a proposition for which there is no supporting evidence, we must assume that the loss suffered by DHHS is an amount equivalent to the amount it paid to Extendicare in excess of the value of services rendered. And because Desai would not have participated in the kickback scheme if it was not profitable for Extendicare, it is not unreasonable to assume that DHHS was overcharged in the amount of the kickbacks, and that the loss DHHS suffered was equivalent to that amount.

The government, which bears the burden of proving otherwise, offers little or no evidence capable of doing so. Speculation that Medicare ends up paying for some medically unnecessary treatments and tests when kickbacks are provided in exchange for the refer-

6. We review for clear error the district court's factual findings as to the amount of restitution. *United States v. Bourne,* 130 F.3d 1444, 1446 (11th Cir.1997).

ral of Medicare patients and services is insufficient to support the government's burden to prove actual losses in each particular case.

Even if we were to accept the government's argument to this effect, the evidence in this case does not come close to supporting an inference that medically unnecessary services were performed by Extendicare as a consequence of the kickback scheme. Vaghela was merely the office manager who selected the lab to perform the tests ordered by the physicians who employed him. But it was the physicians themselves who made the determinations as to which tests were necessary and which were not, and the government offers no evidence (nor, as best we can tell, is there any such evidence to offer) that Drs. Levine and Levine were party to the scheme. There is therefore no basis for concluding that any of the tests ordered from Extendicare and paid for by DHHS were anything other than medically necessary.

We therefore conclude that the government failed to prove that the amount of loss for purposes of restitution in this case was $50,420.02. Instead, we find that amount of the loss for purposes of restitution suffered by DHHS as a result of Vaghela's illegal conduct is equivalent to the amount he received in kickbacks, and not the amount paid to Extendicare for services rendered Medicare.

### III. Conclusion

For the foregoing reasons, we hold that there was insufficient evidence to support Vaghela's conviction for conspiracy to obstruct justice in violation of 18 U.S.C. § 371, and find that the district court erred in its determination that the amount of restitution owed was $50,420.02 and not $23,400. We therefore REVERSE Vaghela's conviction for conspiracy to obstruct justice, AFFIRM his conviction on all other counts, VACATE the order for restitution in the amount of $50,420.02, and REMAND to the district

7. These statutory provisions have been amended in the time since Vaghela's sentencing. *See* 18 U.S.C. §§ 3663, 3663A, 3664 (1997).

court fo
opinion.

CUNA
CO

UNITE

Ur

Mutu
suit seek
Court of
Robert F
judgment
pealed. ⸀
Senior Ci
enue Coc
life insur
holder di
the "impr
surance c
tual [life
precluded
to increas
tual earni
earnings r

Affirn

1. Intern

Inter
required
reduce p
"the exce
[of stock
the avera
earnings
excess" a
when ave

rvices is insuf-
nt's burden to
articular case.

t the govern-
. the evidence
: to supporting
necessary ser-
.endicare as a
)ack scheme.
· manager who
: tests ordered
ad him. But it,
who made the
:sts were neces-
id the govern-
as best we can
e to offer) that
e party to the
: no basis for
:s ordered from
y DHHS were
necessary.

at the govern-
amount of loss
1 this case was
that amount of
itution suffered
'aghela's illegal
amount he re-
the amount paid
rendered Medi-

s, we hold that
ence to support
nspiracy to ob-
18 U.S.C. § 371,
)urt erred in its
int of restitution
ot $23,400. We
hela's conviction
ustice, AFFIRM
:ounts, VACATE
1 the amount of
to the district

1ave been amended
entencing. *See* 18
1997).

court for resentencing consistent with this
opinion.



## CUNA MUTUAL LIFE INSURANCE COMPANY, Plaintiff-Appellant,

v.

## UNITED STATES, Defendant-Appellee.

### No. 98-5033.

United States Court of Appeals,
Federal Circuit.

Feb. 9, 1999.

Mutual life insurance company brought
suit seeking tax refund. The United States
Court of Federal Claims, 39 Fed.Cl. 660,
Robert H. Hodges, Jr., J., granted summary
judgment for government, and taxpayer ap-
pealed. The Court of Appeals, Friedman,
Senior Circuit Judge, held that Internal Rev-
enue Code provision which required mutual
life insurance companies to reduce policy-
holder dividend deduction by "the excess of"
the "imputed earnings rate [of stock life in-
surance companies] over ... the average mu-
tual [life insurance company] earnings rate"
precluded use of a "negative excess" amount
to increase the deduction when average mu-
tual earnings rate was greater than imputed
earnings rate.

Affirmed.

1. Internal Revenue ⟺3976

Internal Revenue Code provision which
required mutual life insurance companies to
reduce policyholder dividend deduction by
"the excess of" the "imputed earnings rate
[of stock life insurance companies] over ...
the average mutual [life insurance company]
earnings rate" precluded use of a "negative
excess" amount to increase the deduction
when average mutual earnings rate was

greater than imputed earnings rate; "excess"
could not be a deficit or deficiency. 26
U.S.C.A. § 809(c)(1).

2. Internal Revenue ⟺3967

Treasury regulation stating that neither
differential earnings rate nor recomputed dif-
ferential earnings rate used for determining
nondeductible portion of dividends paid by
mutual life insurance company could be less
than zero was reasonable interpretation of
governing statute, which required mutual life
insurance companies to reduce deduction by
"the excess of" the "imputed earnings rate
[of stock life insurance companies] over ...
the average mutual [life insurance company]
earnings rate." 26 U.S.C.A. § 809(c)(1); 26
C.F.R. § 1.809-9(a).

Matthew J. Zinn, Steptoe & Johnson, of
Washington, DC, argued for plaintiff-appel-
lant. With him on the brief were James
Walker Johnson and Theodore R. Groom,
Groom & Norlberg, of Washington, DC.

David I. Pincus, Attorney, Tax Division,
U.S. Department of Justice, of Washington,
DC, argued for defendant-appellee. With
him on the brief were Loretta C. Argrett,
Assistant Attorney General and Edward T.
Perelmuter, Attorney.

William B. Harman, Jr. Davis & Harman,
of Washington, DC, amici curiae for The
Stock Company Information Group. On
counsel on the brief were John T. Adney and
Kirk Van Brunt.

Before RADER, Circuit Judge,
FRIEDMAN, Senior Circuit Judge, and
BRYSON, Circuit Judge.

FRIEDMAN, Senior Circuit Judge:

A provision of the Internal Revenue Code
requires a mutual life insurance company to
reduce a particular deduction from its income
(and thereby increase its taxable income) by
"the excess of" the "imputed earnings rate
[of stock life insurance companies] over ...
the average mutual [life insurance company]
earnings rate." The appellant mutual life
insurance company contends that if "the av-
erage mutual earnings rate" is greater rather
than less than "the imputed earnings rate," it
may increase its deduction (and thereby de-